UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A CRIMINAL COMPLAINT CHARGING THE FOLLOWING WITH A VIOLATION OF 21 U.S.C. §§ 846, 841(b)(1)(A)(vi), AND 841(b)(1)(B)(ii): | ) ) ) ) ) ) ) | M.J. Nos.    20-MJ-1408-DLC |

| | |
|---|---|
| (1) DONALD V. ALFONSO a/k/a Moolie, (2) MARK W. ALFONSO a/k/a Chamaquito, (3) BRYANT N. BAEZ a/k/a Mandarria, (4) JOSDANI M. CALDERON, (5) GABRIELA O. DASILVA a/k/a Karrie, (6) KYLE M. DUPRAS a/k/a Zee, (7) ALVIN JAVIER a/k/a Sopha, (8) ANGEL L. LANDRAU-MARRERO a/k/a Chi-Chi, (9) JEISON M. MARINEZ-MATOS, (10) HANLET D. MEJIA-ALVAREZ a/k/a Nephew, (11) LUIS ADOLFO MEJIA-DIAZ a/k/a El Bello, (12) JOSE A. ORTEGA a/k/a Amorol, (13) JESUS RIVERA, and (14) WILKI O. SANZ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Kevin C. Hersey, a Special Agent with the Drug Enforcement Administration,

being duly sworn, depose and state as follows:

**INTRODUCTION**

1.     I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.

2.     I am a Special Agent with the DEA and have been so employed since 1989.  I have been assigned to the New England Field Division since 1997.  I am currently working out of the New England Field Division, New Bedford Resident Office.  Prior to that, I was assigned to the New York Field Division.  My primary duties at the DEA include the investigation of drug trafficking organizations ("DTOs").

3.     During my law enforcement career, I have participated in investigations focused on national organizations, as well as regional and community trafficking organizations.  I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations. I have participated in the preparation of affidavits submitted in Massachusetts courts – both state and federal – in support of applications for criminal complaints, search warrants, tracking warrants, and/or arrest warrants.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.  I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire and electronic communications.

4.      I have participated in more than ten (10) federal wiretap investigations, involving the organized domestic distribution of multi-kilogram quantities of cocaine and fentanyl.  I have been the affiant in numerous wiretap investigations since 1991.  These investigations resulted in the arrest and the dismantling of the distribution, transportation, and supply organizations.

5.      As a result of my experience and training, I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  I have observed and examined cocaine, cocaine base ("crack"), marijuana, methamphetamine, oxycodone, heroin and fentanyl, as well as other controlled substances.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in their trade.

6.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, and national levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.  I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

7.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular

phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

8.    I am familiar with the facts and circumstances of the investigation described herein based on my personal participation in this investigation since approximately July 2018, and I have been made aware of information in this matter that dates to March 2017. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including the following:

   a.  My training and experience investigating narcotics-trafficking and money-laundering crimes;

   b.  Oral reports, written reports, and documents that I have received from DEA and other federal, state, and local law enforcement;

   c.  Physical and video surveillance conducted by me and other federal, state, and local law enforcement officers;

   d.  Confidential sources of information;

   e.  Undercover purchases of narcotics;

   f.  Public records;

   g.  Business records;

    h.   Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    i.   Federal court-authorized GPS tracking data, precise location data, and the use of cell-site simulators;

    j.   Queries of law enforcement records and intelligence databases; and

    k.   Judicially-authorized interceptions over telephones in this investigation.

## PURPOSE OF AFFIDAVIT

9.    This affidavit is being submitted in support of a criminal complaint against the following individuals:

(1)    Donald V. ALFONSO a/k/a "Moolie" ("ALFONSO");

(2)    Mark W. ALFONSO a/k/a "Chamaquito" ("Mark ALFONSO");

(3)    Bryant N. BAEZ a/k/a "Mandarria" ("BAEZ");

(4)    Josdani M. CALDERON ("CALDERON");

(5)    Gabriela O. DASILVA a/k/a "Karrie" ("DASILVA");

(6)    Kyle M. DUPRAS a/k/a "Zee" ("DUPRAS");

(7)    Alvin JAVIER a/k/a "Sopha" ("JAVIER");

(8)    Angel L. LANDRAU-MARRERO a/k/a "Chi-Chi" ("LANDRAU-MARRERO");

(9)    Jeison Manuel MARINEZ-MATOS ("MARINEZ-MATOS");

(10)    Hanlet D. MEJIA-ALVAREZ a/k/a "Nephew" ("MEJIA-ALVAREZ")

(11)    Luis Adolfo MEJIA-DIAZ a/k/a "El Bello" ("EL BELLO");

(12)    Jose A. ORTEGA a/k/a "Amorol" ("ORTEGA");

(13)    Jesus RIVERA ("RIVERA"); and

(14)    Wilki O. SANZ a/k/a UM9131 ("SANZ"),

(collectively, the "Target Subjects") charging that beginning at least in or about April, 2017, and continuing until October 13, 2020, did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute 500 or more grams of cocaine and 400 or more grams of fentanyl, both Schedule II controlled substances, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(vi), and 841(b)(1)(B)(ii)  (the "Target Offense").

10.     This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Target Subjects identified herein have committed the above-described controlled substance offense.

## **BACKGROUND**

11.     In March 2017, DEA began an investigation into the criminal activities of Jesus RIVERA and his drug distribution organization, which was believed to be conducting narcotics trafficking activities in the areas of Fall River, Massachusetts; Westport, Massachusetts; Swansea, Massachusetts; Providence, Rhode Island; Woonsocket, Rhode Island; and New Haven, Connecticut.  This investigation included the use of numerous confidential sources of information, numerous purchases of cocaine and fentanyl from the Target Subjects, seizures of cocaine and fentanyl, the extensive use of pen registers and toll records, the use of precise location information, cell-site simulators, historical cell-site information, surveillance, stationary surveillance, and numerous other traditional investigative techniques, as well as the interception of wire and electronic communications to and from eleven cellular telephones, used by RIVERA, BAEZ, EL BELLO, and ORTEGA. During the course of this investigation, the following telephones were intercepted:

i.   On May 9, 2019, the Honorable Allison D. Burroughs, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial interception of wire and electronic communications to and from telephone number (508) 292-1656 ("target telephone # 1"), used by RIVERA;

ii.   On June 17, 2019, Judge Burroughs signed an Order authorizing the interception of wire and electronic communications to and from target telephone # 1 and to and from telephone number (857) 348-7003 ("target telephone # 2"), both used by RIVERA.

iii.   On August 8, 2019, Judge Burroughs signed an Order authorizing the interception of wire and electronic communications to and from telephone number (401) 588-9420 ("target telephone # 3"), used by EL BELLO,  and to and from telephone number (857) 334-4818 ("target telephone # 4"), used by BAEZ.

iv.   On September 6, 2019, Judge Burroughs signed an Order authorizing the interception of wire and electronic communications to and from  target telephone # 3 and telephone number (401) 441-9374 ("target telephone # 5"), both used by EL BELLO.

v.   On September 26, 2019, Judge Burroughs, signed an Order authorizing the interception of wire and electronic communications to and from telephone number (857) 334-4456 ("target telephone # 6"), used by BAEZ.

vi.   On November 21, 2019, Judge Burroughs signed an Order authorizing the interception of wire and electronic communications to and from telephone number (857) 231-2835 ("target telephone # 8"), used by BAEZ.

vii.   On February 5, 2020, Judge Burroughs signed an Order authorizing the interception of wire and electronic communications to and from telephone number (401) 215-3294 ("target telephone # 9") and to and from telephone number (401) 696-5110 ("target telephone # 10"), both used by EL BELLO.

viii.   On March 5, 2020, Judge Burroughs signed an order authorizing the interception of wire and electronic communications to and from telephone number (401) 696-5110 ("target telephone # 10"), used by EL BELLO, to and from telephone number (401) 919-6302 ("target telephone # 11"), used by ORTEGA, and to and from telephone number (401) 241-3514 (target telephone # 13), used by EL BELLO.

12.   Throughout the course of this investigation, Judge Cabell and other Judges, in the District of Massachusetts and the District of Rhode Island, have signed numerous warrants authorizing the government to obtain precise location information and the use of a cell-site

7

simulator for numerous telephones used in this investigation.

13.     Throughout this affidavit, I describe numerous intercepted calls and identify the participants in those calls. Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information and precise location data. I base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation. Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.   All times referenced herein are approximate.

14.     As detailed below, the Target Subjects used varied codes throughout this investigation to discuss the purchase and sale of cocaine, which they refer to as  "arriba" (Spanish word for up or above); "white ones"; "blond ones"; and "white girl"; and of fentanyl, which they refer to as "blue/purple"; "black ones"; "morenitas"; "chocolate"; and "abajo" (Spanish word for down).[1] The Target Subjects also use the word "pesos" to refer to drugs, and "tickets" or "pesos" to refer to money. They have also used the words "onion," "O's," "ounces," "women/girls," "fingers," "photo," "palomitas," and "pesos" to refer to quantities of drugs. I know from my training and experience that all of these slang terms are commonly used by drug traffickers.

---

[1] I know from my training and experience that the code words "abajo," "black ones," "morenitas," and "chocolate" are commonly used by drug distributors to refer to heroin. Because fentanyl, which is a synthetic opioid, is now commonly mixed with or sold as heroin, I believe the Target Subjects use these words interchangeably to reference both heroin and fentanyl, or a mixture of the two drugs. As detailed herein, laboratory reports confirm that certain seizures made from the Target Subjects in this case were fentanyl (even at times when the Target Subjects used words that historically have referred to heroin when describing the drugs prior to the seizures).  Therefore, I have referenced, throughout this Affidavit, fentanyl and not heroin.

## PROBABLE CAUSE

15.     The criminal activity of the Target Subjects detailed in this affidavit, spanned from March 2017 to October 13, 2020.  The investigation revealed that the Target Subjects, who are charged in this complaint, and others were criminal associates who actively participated in the distribution of cocaine and fentanyl.  The probable cause section of this Affidavit is divided into three sections: Section I, the RIVERA Interceptions, which illustrates the criminal activities of BAEZ, EL BELLO, JAVIER, and RIVERA; Section II, the BAEZ Interceptions, which addresses the criminal activities of ALFONSO, Mark ALFONSO, BAEZ, DASILVA, DUPRAS, LANDRAU-MARRERO and RIVERA; and Section III, the EL BELLO Interceptions, which addresses the criminal activities of EL BELLO, CALDERON, MARINEZ-MATOS, MEJIA-ALVAREZ, ORTEGA, and SANZ.

### I.   The RIVERA Interceptions

16.     Phase One of the investigation focused on RIVERA and his immediate narcotics trafficking organization, spanned from May 2019 to July 2019, and included the interception of target telephone # 1 and target telephone # 2, used by RIVERA.  The investigation revealed that RIVERA and JAVIER, who are charged in this Complaint, and others were criminal associates who actively participated in the distribution of fentanyl and cocaine. The interceptions revealed RIVERA to be a very busy cocaine and fentanyl distributor who distributed 500 grams or more of cocaine and 100 grams or more of fentanyl.  EL BELLO, BAEZ, and others were cocaine sources of supply for RIVERA.  As detailed later in this Affidavit, RIVERA was also, at times, a cocaine source of supply for BAEZ.  JAVIER worked for RIVERA regularly delivering fentanyl and cocaine to numerous low level narcotics customers, including Jermaine Johnson, Michael Lilly, Daniel Correia, Steven Velozo, John Cote, John Ahern, Brian Costa, Gary Rocheleau, and others.

There was one seizure of narcotics during this phase of the investigation, specifically on July 9, 2019, when 14 grams of a substance that field tested positive for cocaine was seized from Johnson and Cote. The cocaine had been delivered by RIVERA. The following is a summary of representative transactions intercepted during this phase of the investigation illustrating the criminal activities of the charged defendants.

      *A.*      *On May 16, 2019, RIVERA Directed JAVIER to Deliver Fentanyl to Customers*

      17.      On May 16, 2019, at approximately 7:45 p.m., RIVERA, using target telephone # 1, spoke to JAVIER, using telephone number (978) 416-1176. JAVIER asked, "What should I take from here?" RIVERA stated, "The 6, only take the 6 black ones that are there." JAVIER stated, "There are only 5 there." RIVERA stated, "Take the 5 then, it's fine. It's one for Sucio, 2 for Chelo, and 2 for Chino." At approximately 8:16 p.m., JAVIER stated. "Tell him to come out." RIVERA asked, "Who?" JAVIER said, "Sucio." At approximately 8:21 p.m., JAVIER asked, "How much is it from each one?" RIVERA stated, "Chelo is going to give you . . . $100 . . . Chino will give you $100 . . . [c]ount it, count it." I believe that JAVIER travelled to 31 Grape Street, Providence, Rhode Island, the residence of RIVERA, and retrieved fentanyl ("black ones"); that JAVIER delivered fentanyl to "Chelo," "Chino," and "Sucio," customers of the organization; and that JAVIER collected payment ("$100") for the fentanyl.

      *B.*      *On May 20-24, 2019, RIVERA Received 150-200 grams of Cocaine from EL BELLO and ORTEGA and RIVERA and JAVIER Distributed the Cocaine to Johnson and other Cocaine Customers*

      18.      On May 19, 2019, RIVERA told Johnson that he was out of cocaine ("I don't have nothing today. I am going to get something tomorrow"). On May 20, 2019, RIVERA negotiated to receive 150-200 grams of cocaine from EL BELLO; RIVERA met with and received the cocaine from ORTEGA, who is a criminal associate of EL BELLO; and RIVERA tasked JAVIER to

deliver cocaine to numerous low level cocaine customers of the organization.  On May 22, 2019, RIVERA confirmed with Luis Villalona-Peguero, a criminal associate of RIVERA, that he had received 200 grams of cocaine from EL BELLO, and on May 23, 2019, RIVERA tasked Bileissy Casado-Ruiz to prepare cocaine for Johnson and JAVIER to deliver the cocaine to Johnson.

19.     On May 20, 2019, at approximately 1:55 p.m., RIVERA, using target telephone # 1, spoke to EL BELLO, who was using telephone number (401) 714-9508.  RIVERA asked EL BELLO for "100 pesos" of the "cotorro."  EL BELLO said, "there is half . . . can't break it" RIVERA stated, "Give me 200 then." RIVERA asked, "[A]t how much are you going to give it to me?"  EL BELLO stated, "At two."  RIVERA explained, "I don't have enough to give it to you complete, as 200 would total $6,000 and change, so I don't have enough for the 200."  EL BELLO asked, "And what about your friend?"  RIVERA stated, "I'm going to give him at least 50."  At approximately 2:12 p.m., RIVERA contacted ORTEGA, who was using telephone number (401) 688-4770.  RIVERA stated, "EL BELLO told me to call you.  I asked him if you could bring me that little thing that I told him."  ORTEGA stated, "He told me that you were going to stop by here because I'm busy, I'm weighing a shit here."  At approximately 2:24 p.m., RIVERA told ORTEGA, "So you have that ready for me because I'm already on my way . . . almost there . . . to do it now."  I believe that RIVERA wanted to get "100" units of  "cotorro" or 100 grams of cocaine from EL BELLO; that the statement that "[t]here is half  . . . can't break it"  meant that EL BELLO had a half a kilogram of cocaine that he needed to sell in its entirety; that RIVERA was willing to purchase "200" grams of cocaine ("Give me 200 then"); that the cost of the cocaine would be "at two" or $32/gram; that RIVERA did not have enough cash for 200 grams of cocaine or $6,000 ("I don't have enough to give it to you complete, as 200 would total $6,000 and change); that RIVERA was going to distribute at least "50" grams of cocaine to his "friend" which was a reference to a

narcotics customer; and that RIVERA contacted ORTEGA; met with ORTEGA; and received the 200 grams of cocaine ("almost there").

20.     On May 20, 2019, at approximately 3:07 p.m., RIVERA agreed to deliver "14" grams of cocaine to Johnson.   At approximately 4:02 p.m., RIVERA told JAVIER, "I have everybody lined up.  Head over to the bowling alley."  RIVERA then directed JAVIER as follows: at approximately 4:34 p.m., RIVERA told JAVIER, "The black guy is there . . . Wait for John as he's almost there . . .[a]nd after then 'Sucio' . . . [a]nd after that go to see 13"; at  approximately 4:36 p.m., RIVERA stated, "'El Sucio' is there . . . the fat lady in her house . . . Paulie, Jackie, 'El Calvo'"; and at approximately 5:24 p.m., RIVERA stated, "'Yaqui' and two for 'TD' and one for the girl, for 'La Flaca,' that's five and another for 'Paulie.'"  I believe that RIVERA was tasking JAVIER to deliver the newly received cocaine to the various cocaine customers of the organization.

21.     On May 22, 2019, at approximately 4:10 p.m., RIVERA spoke to Villalona-Peguero and stated, "I grabbed 200 pesos . . . EL BELLO got me some really good stuff . . . BELLO got it for me at 30 and a half."  I believe that this conversation confirmed that RIVERA received "200" grams of cocaine from EL BELLO and ORTEGA and that the price of the cocaine was $30.50/per gram.

22.     On May 23, 2019, at approximately 8:35 p.m., RIVERA, who was using target telephone # 1, received a text message from Johnson stating, "Need a 7," or "7" grams of cocaine. At approximately 9:06 p.m., RIVERA told Casado-Ruiz, "Mella, open the thing there . . . along with the big bag there, of the white stuff  . . . There's 14 there, but break it into two . . . There's one that has a whole 14.  Take seven out, just weigh seven."  RIVERA then directed JAVIER to "[g]o to Moreno, he's already there" or to deliver the cocaine to Johnson.  I believe that Johnson

wanted "7" grams of cocaine; that Casado-Ruiz weighed the cocaine and delivered the cocaine to

JAVIER; and that JAVIER delivered the cocaine to "Moreno" or Johnson.

        C.   *On June 3, 2019, RIVERA Received 150 Grams of Cocaine from an Associate of Lara-Sanchez*

23.    On June 2, 2019, RIVERA told Johnson that he didn't have any cocaine. ("I don't

have nothing now.  I'm going to see if I can get something later.").  Then, as detailed below, on

June 3, 2019, RIVERA contacted Lara-Sanchez and received 100 grams of cocaine from a criminal

associate known as "Pachuli," with the entire transaction facilitated by Lara-Sanchez; and then

RIVERA confirmed with BAEZ that he had received the cocaine.

24.    On June 3, 2019, at approximately 5:09 p.m., RIVERA, who was using target

telephone # 1, spoke to Lara-Sanchez, who was using telephone number (401) 248-1339.  Lara-

Sanchez stated, "If you want, I can call Pachuli."  RIVERA stated, "Tell him that you want 100

pesos at once.  I'll pay him right there."  At approximately 5:32 p.m., toll records revealed that an

outgoing call was placed by Lara-Sanchez to telephone number (401) 286-2894, known to be a

telephone used by Pachuli.  At approximately 5:32 p.m., Lara-Sanchez told RIVERA, "[I]s going

to get it for me at 32 . . . [Y]ou have to pick it up in Woonsocket."  RIVERA stated, "I'll pick it

up, I need it."  At approximately 6:17 p.m., RIVERA told Lara-Sanchez, "I'm going to head over

there now."  Lara-Sanchez stated, "Head out because he wants to go out."  At approximately 6:19

p.m., RIVERA stated, "[S]end me the address."  Lara-Sanchez stated, "I'm going to send it to you

. . . I'm going to call him so he sends it to me."  At approximately 6:25 p.m., Lara-Sanchez told

RIVERA, "I sent it to you via WhatsApp."  At approximately 6:50 p.m., RIVERA told Lara-

Sanchez, "Pay attention to that phone because I'm already heading over there."  RIVERA stated,

"He's going to leave it at 3-2, right?"  Lara-Sanchez stated, "At 3-2, yes."  At approximately 7:08

p.m., Lara-Sanchez asked RIVERA, "Where are you?  The man is desperate."  RIVERA stated,

"I'm almost there. I'll be there in 3 minutes." At approximately 7:10 p.m., RIVERA told Lara-Sanchez, "I'm going to go inside there with him to check that out . . . I'm not going to grab it just like that." RIVERA stated, "Tell him that I'm outside." At approximately 9:06 p.m., RIVERA told Lara-Sanchez, "I'm going to head over there to bring you that. . . . That was pretty Lapis . . . I liked it . . . [i]t was pretty and I also liked the color . . . like yellowish." Lara-Sanchez stated, "And he gave it at a good price, 32." I believe that Lara-Sanchez facilitated RIVERA's purchase of cocaine by connecting RIVERA with Pachuli ("If you want I can call Pachuli . . . [I]s going to get it for me at 32 . . . [Y]ou have to pick it up in Woonsocket"); that RIVERA wanted 100 grams of cocaine ("Tell him that you want 100 pesos at once. I'll pay him right there"); that the price of the cocaine was $32/gram ("At 3-2, yes"); that RIVERA met with Pachuli and received the cocaine ("I'm going to go inside there with him to check that out . . . Tell him that I'm outside"); and that RIVERA was very pleased with the appearance and therefore the quality of the cocaine ("That was pretty Lapis . . . I liked it . . . [i]t was pretty and I also liked the color . . . like yellowish").

D. *On June 7, 2019, June 19, 2019, and June 26, 2019, RIVERA and JAVIER Delivered Fentanyl and Cocaine to Customer Lilly*

25.     Michael Lilly was a fentanyl and cocaine customer of the organization who redistributed narcotics to his own customers. During the course of this phase of the investigation, RIVERA and JAVIER delivered in excess of 80 grams of fentanyl to Lilly. The following are a few examples of the fentanyl and cocaine deliveries made to Lilly during this investigation.

26.     On June 7, 2019, at approximately 1:25 p.m., RIVERA, using target telephone # 1, told LILLY that he only had "4 grams left." At approximately 5:30 p.m., Lilly asked, "[W]hat is four . . . 240?" RIVERA affirmed. At approximately 5:31 p.m., RIVERA told JAVIER to "grab the four" where the "morenitas," was located. JAVIER asked RIVERA, "[H]ow many morena," and RIVERA answered, "[F]our". RIVERA directed JAVIER where to meet Lilly ("He is going

to wait for you there so you can follow him . . . the crazy guy, at the corner there, by the garage.")

I believe that RIVERA had "4 grams" of fentanyl left for distribution; that the price for the fentanyl

was $240; that RIVERA directed JAVIER where to find the "morenita," which was a reference to

fentanyl; and that JAVIER delivered the fentanyl to Lilly.

27.     On June 19, 2019, RIVERA, using target telephone # 1, communicated with Lilly.

At approximately 9:26 a.m., Lilly asked for "5 of that same stuff from u today."  At approximately

6:44 p.m., RIVERA told JAVIER, "[G]o straight down there because the crazy one is going to be

there."  JAVIER asked, "What am I going to bring him?"  RIVERA stated, "The biggest one that

you have there, the dark one.  They're 5.  The big one and a blond one."  At approximately 6:57

p.m., RIVERA told Lilly, "He is on his way there . . . He is going to give you the five and one."

At approximately 7:07 p.m., RIVERA told Lilly, "[H]e'll be there in 1 minute."  At approximately

7:40 p.m., JAVIER told RIVERA, "I saw the crazy one already."  I believe that Lilly wanted 5

grams of heroin/fentanyl ("5 of that same stuff from u today"); that RIVERA directed JAVIER

where to find the heroin/fentanyl ("the biggest one that you have there, the dark one");  that

RIVERA directed JAVIER to deliver "5" grams of fentanyl and "a blond one" or one gram of

cocaine to Lilly ("They're 5.  The big one and a blond one"); and that JAVIER completed the

delivery of the narcotics to Lilly ("I saw the crazy one already").

28.     On June 26, 2019, at approximately 10:39 a.m., Lilly texted RIVERA, "U give me

six .8 bags . . . and it wasn't good either."  At approximately 10:41 a.m., Lilly texted, "I have

people askin me y its not good like last time . . . I need to pick up some better stuff."  At

approximately 2:11 p.m., RIVERA texted that he had "new stuff."  At approximately 2:28 p.m.,

RIVERA spoke to Lilly.  Lilly stated, "I wanna pick up five . . . I just wanna make sure it's gonna

be five . . . not 4.2 like last time.  It was short .8."  RIVERA stated, "It's gonna be five.  I got it

from the guy like that." Lilly stated, "And it was no good on top of it. . . . [T]wo people I sold to were fucking like, 'What is this?' . . . I told them it was good, and it wasn't." At approximately 4:42 p.m., RIVERA asked, "You want me to send the kid right now?" Lilly affirmed. Lilly stated, "Just do four cause I don't have the whole 2." RIVERA stated, "I have the fucking five together." Lilly and RIVERA agreed on five. At approximately 5:05 p.m., RIVERA texted Lilly, "He is going there now." At approximately 5:33 p.m., RIVERA told Lilly, "[Y]ou only gave me 165, we talked about 180." I believe that Lilly received narcotics from RIVERA on a prior occasion; that Lilly redistributed the narcotics ("two people I sold to were fucking like, 'What is this?' . . . I told them it was good, and it wasn't."); that the quality of the narcotics was poor; that RIVERA had "new stuff" or a new batch of narcotics for Lilly; that Lilly wanted "five" grams of heroin/fentanyl; that Lilly agreed to pay $180 for the narcotics; that Lilly met with the "kid" or JAVIER; that JAVIER delivered fentanyl to Lilly; and that Lilly shorted RIVERA on the payment for the narcotics ("[Y]ou only gave me 165, we talked about 180").

E.      *On June 18-20, 2019, RIVERA Received 50 Grams of Cocaine from BAEZ, Who Had 300 Grams of Cocaine and JAVIER Distributed the Cocaine*

29.     On June 18, 2019, RIVERA received 50 grams of cocaine from BAEZ. The following day, RIVERA confirmed that he had received the cocaine from BAEZ in a conversation with Villalona-Peguero. On June 20, 2019, RIVERA and JAVIER prepared and distributed the cocaine to various customers, including Johnson and Lilly.

30.     On June 18, 2019, at approximately 6:01 p.m., RIVERA, using target telephone # 1, spoke to BAEZ, who was using target telephone # 4. RIVERA asked BAEZ, "[D]o you have some of that little thing?" BAEZ asked, "[O]f the stuff from arriba?" RIVERA affirmed. BAEZ asked RIVERA, "What are you going to need, more or less?" RIVERA stated, "[A]t least 50 pesos." BAEZ affirmed. RIVERA asked, "At how much you are going to give me that

Mandarria."  BAEZ stated, "I can give it to you with the six, I got it with the five . . . because I didn't grab a lot.  I was grabbing a whole one but since it was slow I only grabbed 300 . . . I can give it to you with the five."  At approximately 8:13 p.m., BAEZ stated, "I'm here," and RIVERA stated, "Let me head there."  I believe that BAEZ is a narcotics source of supply for RIVERA; that RIVERA wanted "the stuff from arriba," which was a reference to cocaine; that RIVERA wanted "50 pesos" or 50 grams of cocaine; that BAEZ was charging RIVERA "with the five" or $35/gram; that BAEZ had almost purchased a "whole one," or a kilogram of cocaine, but had taken "300" grams of cocaine instead; and that RIVERA picked up the cocaine from BAEZ ("Let me head there"), as confirmed by a conversation the next day with Villalona-Peguero, during which BAEZ stated that he had already received "some" of the "shit from arriba."

31.     On June 20, 2019, at approximately 9:11 a.m., Johnson asked RIVERA, "[C]an I see you at the alley?"  At approximately 10:28 a.m., Johnson texted, "Need 7."  At approximately 11:50 a.m., RIVERA told JAVIER, "The Moreno is arriving there . . . go over there."  At approximately 12:08 p.m., RIVERA told Johnson, "He should be there in 2 minutes."  At approximately 12:37 p.m., RIVERA asked JAVIER, "[S]ee if the Moreno left the phone in the car."  At approximately 12:39 p.m., JAVIER stated, "Yes, the phone is here."  On June 20, 2019, surveillance observed Cote depart his residence in a Liberty, travel to Clinton Street in Middletown, Rhode Island.  A male positively identified as Johnson got into the Liberty.  Cote and Johnson travelled to the vicinity of "Wendy's" in Providence, Rhode Island. A gold KIA van, known to be used by the RIVERA DTO, arrived.  Johnson got into the KIA, was driven around the block, and then departed the KIA.  The Liberty with Cote and Johnson then left the area.  I believe that JOHNSON wanted "7" grams of cocaine; that RIVERA tasked JAVIER with the delivery of the cocaine; that JAVIER delivered the cocaine to Johnson; that Johnson left his

telephone in JAVIER's car when JAVIER delivered the cocaine to Johnson; and that the transaction between Johnson and JAVIER was surveilled by law enforcement.

32.     On June 20, 2019, at approximately 3:58 p.m., RIVERA, using target telephone # 1, spoke to JAVIER, using telephone number (978) 885-2747.  RIVERA asked, "Did you see the new 'palomitas' that I made/prepared, there on top of the table . . . from those ones, leave two there because the crazy man is going to take two . . . take eight . . . go down there so you can see El Sucio . . . [and] the Acura guy."  I believe that JAVIER was at 31 Grape Street; that RIVERA stored cocaine at that residence ("new 'palomitas' that I made/prepared, there on top of the table"); and that RIVERA was instructing JAVIER to deliver cocaine to customers of the organization.

> F.     *On July 8, 2019, RIVERA Received 30 Grams of Cocaine Facilitated by Villalona-Peguero*

33.     On July 8, 2019, interceptions revealed that RIVERA did not have any cocaine for distribution ("I don't have nothing right now, and I'm gonna get something right now"); that Villalona-Peguero contacted a cocaine source of supply, that Villalona-Peguero arranged for RIVERA to purchase 30 grams of cocaine from the source; that Villalona-Peguero accompanied RIVERA to purchase the cocaine; and that after receipt of the cocaine, RIVERA and Villalona-Peguero delivered cocaine to a cocaine customer of the organization, specifically John Ahern.

34.     On July 8, 2019, at approximately 11:50 a.m., RIVERA, using target telephone # 1, spoke to Villalona-Peguero.  RIVERA stated, "[W]hat about your friend?  Call him to see if he can get me that."  Villalona-Peguero asked, "[W]hat are you going to want?"  RIVERA stated, "30 at least."  At approximately 12:03 p.m., Villalona-Peguero stated, "The kid  . . . can bring the stuff there, to Attleboro."  RIVERA stated, "[T]ell him to bring it with him, that we are going to stop by there now."  At approximately 1:05 p.m., surveillance observed RIVERA and Villalona-Peguero exit the residence at 31 Grape Street in Providence, Rhode Island (RIVERA's residence),

get into a black Malibu, and depart the area.   The Malibu was followed to Attleboro, Massachusetts.  At approximately 1:35 p.m., surveillance observed the Malibu pull up next to a maroon Honda Accord.  A male believed to be Cintron, was observed standing at the rear of the Accord with the trunk open.  Surveillance observed Villalona-Peguero meet with Cintron at the rear of the Honda.  Cintron was observed to retrieve a plastic shopping bag from the trunk of the vehicle.  At approximately 1:59 p.m., the Malibu was observed returning to 31 Grape Street. RIVERA and Villalona-Peguero were observed walking towards the residence.  At approximately 2:01 p.m., surveillance observed Villalona-Peguero exit the residence, walk to the Malibu, and return to the residence carrying a plastic shopping bag.  I believe that RIVERA wanted 30 grams of cocaine; that Villalona-Peguero contacted Cintron to get the narcotics for RIVERA; that RIVERA picked up Villalona-Peguero and they travelled to Attleboro to meet with Cintron; that Villalona-Peguero received the cocaine from Cintron; that RIVERA then distributed some of the cocaine to Ahern, as detailed below.

35.     On July 8, 2019, at approximately 3:08 p.m., RIVERA, using target telephone # 1, spoke to Ahern, a cocaine customer.  RIVERA told Ahern, "Alright, at the bowling."  Ahern stated, "Yeah, just one today."  At approximately 3:25 p.m., an incoming call was received on target telephone # 1 from telephone number (401) 430-9313.  RIVERA spoke to Ahern.  RIVERA stated, "I'm here."   At approximately 3:28 p.m., surveillance observed the black Malibu, occupied by RIVERA and Villalona-Peguero, arrive at the bowling alley in Somerset, Massachusetts.  Ahern was observed exiting his vehicle, walking over to the driver's side window of the Malibu, and briefly meeting with RIVERA.  Both vehicles then departed the area.  At approximately 4:05 p.m., a car stop was conducted on Ahern.  Ahern was arrested for driving with a suspended license.  A search of Ahern was conducted pursuant to his arrest.  No narcotics were found.  I believe that

RIVERA and Villalona-Peguero delivered one gram of cocaine to Ahern and that Ahern managed to conceal the cocaine when searched by the police.

> G. *On July 9, 2019, Law Enforcement Seized 14 Grams of Cocaine from Johnson and Cote, Which had been Delivered by RIVERA*

36.     On July 9, 2019, RIVERA, who was using target telephone # 1, agreed to deliver "14" grams of cocaine to Johnson, and Johnson was going to pay RIVERA "6" or $600 for the cocaine.  At approximately 10:49 a.m., RIVERA and Johnson agreed to meet at "the alley, an hour?"  At approximately 11:04 a.m., Johnson stated, "I got six . . . uh . . . 14."  RIVERA affirmed. At approximately 1:11 p.m., RIVERA stated, "I'm almost there in 3, 5 minutes."  At approximately 12:55 p.m., surveillance observed RIVERA leave his residence carrying an unknown white item. At approximately 1:20 p.m., surveillance at the bowling alley then observed RIVERA arrive in the parking lot in the black Malibu.  Johnson was observed getting out of his vehicle, walking to the vehicle driven by RIVERA, leaving the area of RIVERA's vehicle, and departing the area.  A car stop of Johnson's vehicle revealed a bag of rock like white powder, which field tested positive for the presence of cocaine, located in the area of the shift console of the vehicle and a second smaller bag of a white substance that was found on the floor of the vehicle.  John Cote, who was also in the vehicle, and Johnson were arrested and charged with possession with intent to distribute a Class B substance.  I believe that RIVERA delivered 14 grams of cocaine to Johnson and Cote just prior to the car stop and seizure of the narcotics.

37.     On July 9, 2019, after the car stop, the following interceptions occurred confirming that RIVERA had delivered 14 grams of cocaine to Johnson, which was seized by law enforcement:  at approximately 1:02 p.m., RIVERA, who was using target telephone # 2, told a criminal associate, "Damn it.  The guy that I just saw got pulled over by the police"; at approximately 1:23 p.m., Johnson told RIVERA, "Got pulled over by police"; at approximately

1:53 p.m., RIVERA, who was using target telephone # 2, told Casado-Ruiz, "They just arrested John . . . [h]im and Moreno," Casado-Ruiz asked "With stuff," and RIVERA affirmed; and at approximately 7:24 p.m., Villalona-Peguero asked RIVERA, "They found something on him" and RIVERA stated, "Of course . . . 14 . . . and a palomita."   Based on the investigation, I believe that RIVERA reported to Villalona-Peguera that he had delivered "14 . . . and a palomita," which was a reference to 14 grams of cocaine and a "palomita," which is an additional unknown quantity of cocaine.

## II.    The BAEZ Interceptions

38.    Phase Two of the investigation focused on BAEZ and his immediate narcotics trafficking organization, spanned from August 2019 to December 2019, and included the interception of target telephone # 4, target telephone # 6, and target telephone # 8, used by BAEZ. The investigation revealed that BAEZ, RIVERA, LANDRAU-MARRERO, ALFONSO, Mark ALFONSO, DASILVA, and DUPRAS, who are charged in this Complaint, and others, were criminal associates who actively participated in the distribution of cocaine and fentanyl.  The investigation revealed that BAEZ was an active fentanyl and cocaine distributor; that DUPRAS, DASILVA, LANDRAU-MARRERO, and RIVERA were narcotics customers of BAEZ, who each further distributed narcotics; that ALFONSO was a fentanyl and cocaine source of supply for BAEZ; that ALFONSO worked with his nephew Mark ALFONSO in the distribution of narcotics, including on December 4, 2019, when approximately 128 grams of cocaine was seized from Mark ALFONSO; and that RIVERA and BAEZ continued to distribute narcotics to each other, including 98 grams of cocaine on December 13, 2019, which was seized from RIVERA, prior to being delivered to BAEZ.  Based on these interceptions, I believe that BAEZ distributed in excess of 500 grams of cocaine and 100 grams of fentanyl; that LANDRAU-MARRERO distributed in excess

of 500 grams of cocaine and 100 grams of fentanyl; that ALFONSO distributed in excess of 500 grams of cocaine and 100 grams of fentanyl; that Mark Alfonso distributed 128 grams of cocaine; that DUPRAS received and distributed in excess of 300 grams of cocaine; and that DASILVA received and distributed in excess of 500 grams of cocaine and 50 grams of fentanyl.  The following is a summary of representative transactions intercepted during this phase of the investigation illustrating the criminal activities of the charged defendants.

     A.    *On August 10, 2019, and August 14, 2019, DUPRAS Received 156 Grams of Cocaine from BAEZ*

39.    Kyle DUPRAS, who used telephone number (774) 707-9264, was a cocaine customer of the organization who redistributed narcotics to his own customers.  During the course of this phase of the investigation, BAEZ delivered in excess of 300 grams of cocaine to DUPRAS. The following are a few examples of the cocaine deliveries made to DUPRAS, during this matter.[2]

40.    On August 10, 2019, at approximately 9:27 p.m., BAEZ, who was using target telephone # 4, spoke to DUPRAS.  BAEZ stated, "I probably got half of what you been taking . . . I got two O's left."   DUPRAS stated, "I'll take them . . . bring it over here."  At approximately 10:58 p.m., BAEZ sent a text message to DUPRAS that stated, "Downstairs."  I believe that DUPRAS typically received 4 ounces, or 112 grams, of cocaine from BAEZ ("I probably got half of what you been taking"); that BAEZ had "two O's" or ounces of cocaine, which is approximately 56 grams; that DUPRAS wanted the narcotics ("I'll take them"); and that BAEZ delivered the narcotics to DUPRAS.

41.    On August 14, 2019, at approximately 9:42 a.m. and thereafter, BAEZ, received

---

[2] In addition to the August 10, 2019, August 14, 2019, and August 17, 2019 transactions detailed in this Affidavit, DUPRAS was intercepted on August 23, 2019, October 17, 2019, and October 21, 2019, participating in similar cocaine transactions with BAEZ.

and sent a series of text messages to/from DUPRAS.  DUPRAS asked, "How much u got 4 me."

BAEZ responded, "100."   DUPRAS asked, "How much?"   BAEZ answered, "36.5."   At

approximately 10:57 a.m., surveillance observed DUPRAS depart a residence located at 222

Division Street in Fall River, Massachusetts, which is believed to be DUPRAS's residence.

DUPRAS travelled to BAEZ's residence.  At approximately 11:15 a.m., stationary surveillance at

156 Wellington Street in Fall River (BAEZ's residence) observed DUPRAS park across the street

from the residence, exit the vehicle, and enter the driveway of BAEZ's residence.   At

approximately 11:22 a.m., DUPRAS was observed departing the driveway, entering his vehicle,

and departing the area.  Surveillance observed DUPRAS travel to the corner of Brownell Street

and North Court Street in Fall River.  A heavyset male was observed walking to the vehicle and

entering the passenger side of the vehicle.  In less than two minutes, DUPRAS left the area without

the male passenger.  I believe that BAEZ had "100" grams of cocaine available for DUPRAS; that

the price of the cocaine was "36.5" or $36.50/per gram; that DUPRAS met with and received the

narcotics from BAEZ; and that DUPRAS was then observed on surveillance to be conducting a

narcotics transaction.

> **B.** *On August 17, 2019, BAEZ Received 56 Grams of Cocaine from ALFONSO and Delivered the 56 Grams of Cocaine to DUPRAS*

42.   On August 17, 2019, BAEZ, who was using target telephone # 4, received 56 grams

of cocaine from ALFONSO, who was using telephone number (401) 696-6978, and delivered it to

DUPRAS.

43.   On August 17, 2019, a series of text messages were received by BAEZ, from

DUPRAS, indicating that DUPRAS wanted to meet with BAEZ ("Can u see me . . . [t]omorrow .

. . early . . U ready").  At approximately 1:12 p.m., BAEZ sent a text message to ALFONSO,

stating, "May need 3."  At approximately 1:18 p.m., BAEZ told ALFONSO, "I just showed him

the picture . . . He said, 'I might grab three,'" ALFONSO stated, "I think I got four, I think I got five right now, I'm gonna get rid of another one and a dude told me to hold two . . . I'll try to hold at least two." At approximately 4:02 p.m., BAEZ confirmed with ALFONSO, "Hold those three down . . . he is gonna take them." ALFONSO stated, "[T]wenty minutes." At approximately 4:26 p.m., BAEZ stated, "I'm here." ALFONSO stated, "[T]here is only two of them." At approximately 4:57 p.m., BAEZ told DUPRAS, "Downstairs buddy." DUPRAS affirmed. At approximately 6:05 p.m., BAEZ received a text message from DUPRAS which stated, "Yo I cooked 10 n lost 8 grams cuz." At approximately 6:18 p.m., DUPRAS told BAEZ, "I tried . . . out of ten . . . I put ten even . . . see what I get off the ten, that's what I always do just to see how much it comes up with ten grams you know what I'm saying." BAEZ stated, "[I]ts the same one . . . [s]ame exact thing . . . just do another attempt and I'll give it to you." At approximately 7:33 p.m., DUPRAS told BAEZ, "[Y]ou gonna have to take all these bags . . . I just sold ten to Marcus and did it in front of him, the same thing . . . a whole twenty." BAEZ stated, "[T]hat's crazy . . . I showed you I got like three or four hundred grizzies left from the same one." I believe that DUPRAS wanted cocaine from BAEZ; that BAEZ met with DUPRAS and showed him a "picture" or sample of the cocaine ("I just showed him the picture"); that BAEZ believed that DUPRAS wanted "3" ounces or 84 grams of cocaine from BAEZ ("[h]e said, 'I might grab three'"); that BAEZ was trying to get the 3 ounces of cocaine from ALFONSO, to distribute to DUPRAS ("May need 3:); that ALFONSO initially had "five" ounces of cocaine available for distribution ("I think I got four, I think I got five right now, I'm gonna get rid of another one and a dude told me to hold two"); that ALFONSO only had "2" ounces of cocaine or 56 grams of cocaine available for distribution to BAEZ ("[T]here is only two of them"); that ALFONSO delivered the 56 grams of cocaine to BAEZ ("I'm here"); that BAEZ delivered 56 grams of cocaine to DUPRAS

("Downstairs buddy"); that DUPRAS attempted to cook the cocaine and when he did he lost 8

grams of the cocaine ("Yo I cooked 10 n lost 8 grams"); that DUPRAS had sold 10 grams of

cocaine to Marcus, cooked the cocaine, and had the same result ("I just sold ten to Marcus and did

it in front of him, the same thing . . . a whole twenty"); and that BAEZ went to the location of

DUPRAS to assess the situation with the cocaine.

       C.   *On August 18, 2019, LANDRAU-MARRERO Received 192 Grams of Cocaine*
           *Prepared by BAEZ*

44.     On August 18, 2019, at approximately 8:36 p.m., BAEZ, using target telephone #

4, spoke to LANDRAU-MARRERO, using telephone number (774) 770-1718.  LANDRAU-

MARRERO stated, "I wanted to see if you can do that for me, throw it."  BAEZ asked, "You want

me to do it for you?"  LANDRAU-MARRERO affirmed.  LANDRAU-MARRERO stated,

"[T]ake out an onion and 14 on top . . . 42 . . . add 150.  It will come up to 192."  BAEZ stated,

"I'm going to stretch it to 192."  LANDRAU-MARRERO said, "Call me when it's ready so I can

come and get them."  BAEZ stated, "All set."  I believe that LANDRAU-MARRERO was getting

"an onion and 14" or 42 grams of cocaine from BAEZ; that LANDRAU-MARRERO wanted

BAEZ to cut the cocaine with 150 grams of cut; that the resulting amount of cocaine was 192

grams; that BAEZ prepared the cocaine per LANDRAU-MARRERO's instructions; and that

LANDRAU-MARRERO was going to pick up the cocaine from BAEZ.

       D.   *On August 18-19, 2019, DASILVA Received 28 Grams of Cocaine from BAEZ and*
           *At Least 18 Grams of Fentanyl, Which BAEZ Had Received from LANDRAU-*
           *MARRERO*

45.     On August 18-19, 2019, BAEZ, using target telephone # 4, delivered 28 grams of

cocaine to DASILVA, who was using telephone number (508) 858-7691; BAEZ picked up 10

grams of fentanyl from DASILVA, which BAEZ had previously supplied to her, that was low

quality; BAEZ took the 10 grams of fentanyl to LANDRAU-MARRERO who was using telephone

number (774) 770-1718; BAEZ gave the fentanyl to LANDRAU-MARRERO for a different 10 grams of fentanyl; BAEZ delivered the new fentanyl plus an additional 8 grams of fentanyl to DASILVA; and DASILVA distributed the fentanyl to a customer who said the quality of the new fentanyl was poor.

46.     On August 18, 2019, at approximately 1:06 p.m., BAEZ spoke to DASILVA. DASILVA asked, "Are you going to give me something to blend with this . . . you are bringing me garbage I can't even blend anything . . . back then I could put one on one, and I could sell it fast, now you are getting me shit . . . I put 4 grams on what you gave me . . . bad is bad." DASILVA explained, "I don't want to lose this woman . . . I gotta go meet her . . . she wants it all." At approximately 8:34 p.m., DASILVA stated, "[T]hat woman . . . took ten . . . I only have left the ten." BAEZ stated, "Leave it there.  I'm going to change that for you tomorrow . . . I'm going to throw something more on top for you."  On August 19, 2019, at approximately 7:26 p.m., BAEZ stated, "I'm on the way."  DASILVA asked, "[W]hat are you bringing me?  BAEZ stated, "I'm bringing you one of mine."  DASILVA stated, "I need two."  BAEZ stated, "I have one.  I'm already on my way to you already . . . ."  DASILVA stated, "[T]he shit you gave me of you know what . . . all I have left is 10.  I wanted to know if you can bring me more then what I usually get . . . I mean 20 of the other one, but it has to be good, so I can talk to that woman . . . I told her that I would take care of her."  BAEZ explained, "[W]hat I am going to do now, I'm going to get the 10 that you have I'm going to bring you mine and the 10 that you have I'm gonna meet up with him.  I'm going to change it and then I'll bring it back to you."  BAEZ stated, "I'll bring you the 20 and you give me the 10."   I believe that DASAILVA had received 20 grams of fentanyl from BAEZ ("[T]hat woman . . . took ten . . . I only have left the ten"); that the quality of the fentanyl was poor (you are bringing me garbage I can't even blend anything"); that BAEZ was going to

pick up the 10 grams of fentanyl and "change it," which was a reference to the 10 grams of fentanyl,

out for a higher quality fentanyl ("the 10 that you have I'm gonna meet up with him.  I'm going to

change it and then I'll bring it back to you"); that DASILVA wanted "20" grams of heroin/fentanyl

total from BAEZ; that BAEZ agreed to deliver 20 grams of heroin/fentanyl to DASILVA ("I'll

bring you the 20 and you give me the 10)"; and that BAEZ was also taking DASILVA "one" ounce

of cocaine, or 28 grams ("bringing you two of mine").

47.     On August 19, 2019, at approximately 7:48 p.m., BAEZ, spoke to LANDRAU-

MARRERO.  BAEZ explained, "[T]his broad, she has 10 'palitos' left to change them for her.

What more are you going to give her extra?"  LANDRAU-MARRERO stated, "I really can't do

any because I have about 25 left.  When I grab more later tomorrow, I can throw five on top."

LANDRAU-MARRERO stated, "I will give her 10." I believe that the "broad" was a reference to

DASILVA; that "she has 10 palitos to change" was a reference to the 10 grams of fentanyl; that

BAEZ wanted to know whether LANDRAU-MARRERO was going to give her "extra" narcotics

for the trouble of having sold the low quality narcotics; that LANDRAU-MARRERO was going

to give her "5" grams extra; but that LANDRAU-MARRERO only had "25" grams of fentanyl

remaining and would give her the extra fentanyl another time; that LANDRAU-MARRERO

agreed to "give her 10"; and that BAEZ took 18 grams from LANDRAU-MARRERO.

48.     On August 19, 2019, at approximately 8:03 p.m., a series of text messages were

exchanged between BAEZ and DASILVA indicating that BAEZ was arriving at DASILVA's

house and that he had left something there for DASILVA.  At approximately 10:00 p.m., BAEZ

spoke to DASILVA.  DASILVA stated, "This is no good . . . This bitch just did it now and said

this is no fucking good . . . She is even saying that the one you took was even better than this one."

I believe that BAEZ had received 10 grams of fentanyl from DASILVA, taken the fentanyl to

LANDRAU-MARRERO, gotten a different batch of fentanyl, delivered the new batch to DASILVA, DASILVA delivered the fentanyl to her customer, and then DASILVA provided information that the new batch of fentanyl was worse than the prior batch ("This bitch just did it now and said this is no fucking good . . . She is even saying that the one you took was even better than this one").

### E.   On August 20, 2019, BAEZ Discussed 10 Grams of Fentanyl with ALFONSO

49.     On August 20, 2019, at approximately 5:53 p.m., an outgoing text message was sent from target telephone # 4 to telephone number (401) 696-6978, used by ALFONSO.  The text message stated, "Yo can u get brown."  ALFONSO sent a text message that affirmed.  At approximately 5:53 and 5:54 p.m., two outgoing text messages were sent by BAEZ that stated, "Need a fing" and "But it gotta be fire."  At approximately 5:56 p.m., ALFONSO sent a text message, which stated, "Gotta take ticket."   I believe that BAEZ wanted "brown" or heroin/fentanyl; that BAEZ wanted a "fing" or finger, which is 10 grams; that BAEZ wanted "fire" or high quality narcotics; and that ALFONSO's statement "gotta take ticket" meant that BAEZ would have to pay for the fentanyl upon receipt.

### F.   On August 23-24, 2019, BAEZ Delivered 28 Grams of Cocaine and 20 Grams of Fentanyl to DASILVA

50.     On August 23, 2019, DASILVA, who was using telephone number (617) 459-8408, requested cocaine and fentanyl from BAEZ, who was using target telephone # 4.  BAEZ did not, initially have the fentanyl.  BAEZ obtained the fentanyl and delivered the narcotics to DASILVA. The following day, DASILVA confirmed that she had distributed the fentanyl to a customer and that the quality of the fentanyl was good.  The following are the detailed calls of this transaction.

51.     On August 23, 2019, at approximately 2:20 p.m., DASILVA, told BAEZ, "I want yours, one more . . . and what are you bringing me of the other one?"  BAEZ stated, "When I find

something, what you always grab, two."  BAEZ stated, "[M]y friend told me, 'For you to get out of this problem, this is what I'm gonna try to to do.' He will grab a whole one. He's going to give it to me, and I'll get it out little by little."  DASILVA asked, "What is a whole?"  BAEZ stated, "A whole square."  DASILVA asked, "How much is that?"  BAEZ stated, "A lot of money . . . [a]t least like 60,000 pesos."  BAEZ stated, "I will get you something for now."  At approximately 6:43 p.m., BAEZ told DASILVA, "[T]hey are gonna bring me that now.  I'm gonna go get it actually . . . the one from 'abajo.'"  DASILVA stated, "I hope it's good this time."  DASILVA confirmed, "[B]ring me 2."  At approximately 7:36 p.m., BAEZ stated, "Come over . . . how long."  DASILVA stated, "[L]ike 10 minutes."  At approximately 8:06 p.m., DASILVA stated, "I'm outside," and "Are you coming here to my car?"  BAEZ affirmed.  At approximately 8:09 p.m., stationary surveillance at 158 Wellington Street in Fall River observed a four door sedan with Massachusetts registration "Gabby1" parked in front of the residence.  At approximately 8:12 p.m., a male believed to be BAEZ crossed the street and got into a separate sedan parked on the street. BAEZ was in the vehicle for a couple of minutes.  A female, confirmed to be DASILVA on October 11, 2019, was then observed getting out of the four door sedan and walking up to the open driver's side door of the vehicle occupied by BAEZ.  DASILVA appeared to place something inside her shirt or coat.  At approximately 8:14 p.m., DASILVA got into her vehicle and departed the area.  I believe that DASILVA wanted "one" or 28 grams of "yours" or cocaine; that DASILVA wanted "two" of the "other one," which was a reference to 20 grams of heroin/fentanyl; that BAEZ did not initially have the fentanyl; that BAEZ made arrangements to get the one from "abajo," or fentanyl ("[T]hey are gonna bring me that now.  I'm gonna go get it actually . . . the one from 'abajo'"); and that at approximately 8:12 p.m. or shortly thereafter, BAEZ delivered the fentanyl and cocaine to DASILVA, as observed on stationary surveillance.

52.     On August 24, 2019, at approximately 11:30 a.m., BAEZ asked DASILVA, "Everything fine?"  DASILVA stated, "I have to call . . . that bitch . . . I gave this morning." DASILVA called back and stated, "[M]y half of gram into your gram . . . She said it's not the bomb, but it's good."  DASILVA stated, "So just know it's not great so please don't fucking step on it."  BAEZ stated, "So that's good, you can add 10 to 20 and it's going to be good."  I believe that this call confirms that BAEZ delivered fentanyl to DASILVA the previous evening; that DASILVA cut the fentanyl ("[M]y half of gram into your gram"); that DASILVA distributed the narcotics to a customer; that the customer was happy with the quality of the narcotics ("She said it's not the bomb, but it's good.").

G.     On *August 23-24, 2019, BAEZ Received 200 Grams of Cocaine from ALFONSO*

53.     On August 23, 2019, BAEZ, using target telephone # 4, requested 200 grams of cocaine from ALFONSO, who was using telephone number (508) 493-9879, and on August 24, 2019, ALFONSO delivered the cocaine, as evidenced by calls between BAEZ and ALFONSO and calls between BAEZ and UM7755, as detailed below.

54.     On August 23, 2019, at approximately 11:11 a.m., BAEZ spoke to ALFONSO. ALFONSO stated, "I'm gonna wait to see what happens later on.  Worst case I'll bring you the 200 bucks anyway for the car insurance."  ALFONSO explained, "Yeah it will be tonight.  It will be tonight.  But make sure, I'm gonna let you know during the day, so make sure if I tell you, 'Yo I gotta go see you,' is cause the you know what I mean."  BAEZ asked, "If them other ones . . . [c]ome through you tell me, oh just come right here."  At approximately 8:42 p.m., an incoming text message from ALFONSO stated, "I have that 200 u let my girl borrow yesterday."  BAEZ affirmed.   I believe that ALFONSO was looking for 200 grams of cocaine for BAEZ ("[W]orst case I'll bring you the 200 bucks anyway for the car insurance"); that BAEZ wanted to know if

ALFONSO was able to secure the narcotics ("If them other ones . . . [c]ome through you tell me, oh just come right here"); and that that ALFONSO obtained the 200 grams of cocaine ("I have that 200 u let my girl borrow yesterday.").

55.     On August 24, 2019, at approximately 1:20 p.m., BAEZ spoke to UM7755. UM7755 stated, "I got a peso for you."  BAEZ stated, "I don't have anything right now . . . I got something the other day, and it left quickly."  I believe that UM7755 wanted 100 grams of cocaine from BAEZ; that BAEZ indicated that he did not have any cocaine; and that BAEZ explained that he had cocaine but that it had been distributed quickly.

56.     On August 24, 2019, at approximately 12:27 a.m., an incoming text message from ALFONSO stated, "[S]ee you early afternoon."  At approximately 2:11 p.m., an incoming text message from ALFONSO stated, "Lmk wen u around."  At approximately 2:16 p.m., an outgoing text message from BAEZ stated, "Am home."  At approximately 2:48 p.m., an incoming text message was received on target telephone # 4 from telephone number (508) 493-9879, used by ALFONSO.  The text message stated, "Omw."  I believe that ALFONSO was delivering 200 grams of cocaine to BAEZ.

57.     On August 24, 2019, at approximately 3:11 p.m., BAEZ contacted UM7755 and stated, "I got something so . . . [w]hat your buddy wanted?"  UM7755 stated, "[H]e supposedly wanted 100 grams but I told him there was nothing around."  BAEZ stated, "Call him and call me back."  At approximately 3:12 p.m., an incoming call was received on target telephone # 4 from telephone number (857) 492-7755.  BAEZ spoke to UM7755.  UM7755 asked, "[H]ow much are you going to charge him?"  BAEZ stated, "36.5" and "Call me back."  I believe that BAEZ received 200 grams of cocaine from ALFONSO; that BAEZ then called UM7755, who had previously requested 100 grams of cocaine to inform UM7755 that he now had cocaine available for

distribution; that the price of the cocaine was "36.5" or $36.50/gram; and that UM7755 was going to check with the customer regarding whether the customer still wanted the cocaine.

### H.   On October 3, 2019, BAEZ Delivered 126 Grams of Cocaine to DASILVA

58.     On October 3, 2019, at approximately 3:22 p.m., BAEZ, who was using target telephone # 6, spoke to DASILVA, who was using telephone number (857) 654-2955.  DASILVA stated, "[L]ast time . . . [y]ou told me you was gonna give me . . . four ounces . . . all you brought me was 100 grams, and you say you would owe me twelve."  DASILVA stated, "[H]ow long for you to give me five?"  BAEZ stated, "Forty-eight . . . I'm giving it to you the best I can."  DASILVA asked, "Are you sure that's the best price?"  DASILVA stated, "I'll wait for you here."  I believe on a prior occasion, DASILVA had ordered "four ounces" of cocaine from BAEZ; that BAEZ had only delivered "100" grams of cocaine; that DASILVA wanted "five" ounces of cocaine from BAEZ this time or 140 grams of cocaine; that the price for the cocaine was "48" or $4,800, which is $34/gram; and that on this occasion, DASILVA received four and a half ounces or 126 grams of cocaine from BAEZ, according to a call on October 9, 2019, as detailed later in this Affidavit.

### I.   On October 6-9, 2019, BAEZ Received Blue/Purple Fentanyl from ALFONSO

59.     As detailed below, on October 6-8, 2019, a series of conversations and text messages were intercepted that indicated that on October 6, 2019, ALFONSO, who was using telephone number (401) 585-3737,  delivered to BAEZ, using target telephone # 6, a sample of blue/purple colored fentanyl; that BAEZ asked DASILVA, who was using telephone number (857) 654-2955, for cut for the fentanyl; that BAEZ distributed the sample to LANDRAU-MARRERO, who was using telephone number (774) 770-1718, to be tested; that the quality of the fentanyl was high; that on October 7, 2019, BAEZ requested more fentanyl from ALFONSO; that on October

8, 2019, ALFONSO delivered an additional quantity of blue/purple fentanyl to BAEZ; and that BAEZ confirmed that he had the fentanyl in a conversation with RIVERA, who was using telephone number (774) 320-9169, on October 9, 2019.

60.     On October 6, 2019, a series of text messages were sent between BAEZ and ALFONSO.  The text messages indicated that ALFONSO was going to deliver something to BAEZ ("see you little bit . . . afta pats game").  At approximately 6:24 p.m., BAEZ contacted DASILVA and asked, "Do you have . . . that shit that you use to cut/mix the one from 'abajo.'" DASILVA said, "No more . . . I buy on Amazon to mix with the one from 'abajo' . . . Mannitol . . . for coke Inositol . . . [f]or the other one, it's called Mannitol."  BAEZ explained, "I just needed a little . . . I mean not much, but . . . I mean like maybe in the future I might gonna use it but yeah." At approximately 10:18 p.m. an outgoing text message was sent by BAEZ to ALFONSO which stated, "Looks like someone drop ink on it."  At approximately 10:23 p.m., ALFONSO sent a text message and asked, "whatvu think?"  BAEZ stated in a text, "Looks funny but I'll let u know."  I believe that BAEZ received a blue/purple sample of fentanyl from ALFONSO; that BAEZ wanted cut from DASILVA to process the fentanyl; and that BAEZ was going to distribute the fentanyl to people to assess the quality of the fentanyl.

61.     On October 7, 2019, at approximately 2:04 p.m., BAEZ, who was using target telephone # 6, spoke to LANDRAU-MARRERO.  BAEZ asked, "[W]hat did they tell you about that little thing?"  LANDRAU-MARRERO stated, "I gave it to one person only and told me it was good . . . what I did was that instead bringing it up to six I brought it up to five."  LANDRAU-MARRERO stated, "[T]hat looks like violet . . . that looks real nice."  BAEZ stated, "[H]e was told that it was super good."  I believe that BAEZ had given LANDRAU-MARRERO a sample of the purple fentanyl; that LANDRAU-MARRERO had given the sample to a criminal associate;

that the criminal associate of LANDRAU-MARRERO had tested/used the fentanyl; and that the criminal associate of LANDRAU-MARRERO stated that the quality of the fentanyl was "good."

62.     On October 7, 2019, at approximately 2:42 p.m., an incoming text message was received from ALFONSO which stated, "Fuck w a real nigga asap . . . I can exchange that pocketbook if need b pretty sure dye pack exploded wen she took it off rack at Nordstroms."  At approximately 8:12 p.m. an outgoing text message was sent by BAEZ, which stated, "I'll take it," included two fire emojis, and said, "Morro." At approximately 10:41 p.m., BAEZ spoke to LANDRAU-MARRERO.  BAEZ explained, "The 'Morena' is coming around in the morning." LANDRAU-MARRERO stated, "Hit me up when you're ready with that 'Morenita,' I'll go see you and also give you the tickets."  I believe that these communications concerned the sample of blue/purple fentanyl ("I can exchange that pocketbook if need b pretty sure dye pack exploded wen she took it off rack at Nordstroms"); that BAEZ decided to get more of the fentanyl for distribution ("I'll take it"); that ALFONSO was going to deliver the fentanyl the following day; and that LANDRAU-MARRERO wanted to know when the "morena/morenita" or fentanyl arrived.

63.     On October 8, 2019, a series of text messages occurred between BAEZ and ALFONSO.  At approximately 11:51 a.m., ALFONSO stated, "Hit me afta school."  BAEZ stated, "I get out 1:45."  At approximately 2:10 p.m., BAEZ texted, "Yo."  At 2:30 p.m., ALFONSO texted. "Yo yo."  At 2:33 p.m., BAEZ texted, "Am home."  At approximately 2:34 p.m., ALFONSO texted, "Ok . . . see u in 30 min."  At approximately 3:13 p.m., ALFONSO texted, "Omw . . . 3 . . . 4 min tops."  I believe that ALFONSO was in route to BAEZ's residence to deliver an unknown quantity of blue/purple fentanyl to BAEZ for distribution.

64.     On October 9, 2019, at approximately 4:28 p.m., an outgoing call was placed on

target telephone # 6 to telephone number (774) 320-9169.  BAEZ spoke to RIVERA.  BAEZ stated, "I forgot to tell you that I have some stuff from 'abajo' that is  . . . man . . . it breaks heads/blows minds . . . guaranteed  . . . From one to two . . . It is really really good . . . [I]t's not from the 'F' . . . original . . . It's even kind of blue . . . It has a color . . . but I already passed it on . . . I made four out of one and they gave it an eight."  RIVERA stated, "Oh, so it is really good." I believe this conversation was affirmation that BAEZ received the blue/purple fentanyl from ALFONSO; that BAEZ had received "stuff from abajo," which was code for heroin/fentanyl; that the quality of the drugs was "really really good"; that BAEZ believed or was stating that the drugs were heroin ("original") and not fentanyl (not from the "F,"); that the drugs had a "blue . . . color"; and that BAEZ had already distributed some of the drugs and that the customer reported the drugs were very high quality  (an "8") even after it was cut ("I made four out of one").

J.   *On October 9, 2019, BAEZ Distributed 126 Grams of Cocaine to DASILVA*

65.   On October 9, 2019, at approximately 7:21 p.m., BAEZ, using target telephone # 6, told DASILVA, using telephone number (857) 654-2955, "I got the thing from 'abajo' . . . I added three to one and they gave me an eight."  DASILVA said, "Wow . . . [t]hat has to be fentanyl."  BAEZ stated, "No . . . it's not that."  At approximately 7:48 p.m., DASILVA stated, "I want the same as last time."  BAEZ stated, "I brought you . . . I think it was . . . four and a half . . . the last time you took four and a half."   DASILVA stated, "[F]our and a half . . . that's what I want."  DASILVA stated, "[I]t was 48."  At approximately 9:26 p.m., BAEZ stated, "I already have it prepared . . . I'll call you when I am around there."   At approximately 10:32 p.m., an outgoing call was placed on target telephone # 6 to telephone number (857) 654-2955.  DASILVA did not answer the phone.  I believe that DASILVA wanted to buy more cocaine from BAEZ; that BAEZ and DASILVA confirmed that BAEZ had received "four and a half" ounces or 126 grams

of cocaine on the prior delivery; that DASILVA had paid "48" or $4,800 for the cocaine; that DASILVA wanted the "same" or "four a half" ounces of cocaine this time; and that BAEZ delivered the cocaine to DASILVA, just after the 10:32 p.m. attempted call.[3]

      *K.   October 12, 2019, BAEZ Distributed 200 Grams of Cocaine to LANDRAU-MARRERO*

66.     On October 12, 2019, at approximately 4:37 p.m., BAEZ, using target telephone # 6, spoke to LANDRAU-MARRERO, who was using telephone number (774) 770-1718. LANDRAU-MARRERO stated, "I might have a 250 soon . . . He wants me to ask how much it costs." BAEZ asked, "[T]wo and a half with the paper there?" LANDRAU-MARRERO stated, "Yeah he had the money for it." At approximately 6:38 p.m., LANDRAU-MARRERO stated, "[H]e wants to buy 100 but wants to see it. When I'm going to see you, you show it to him and if . . . I am going to go back and go grab another one." BAEZ stated, "I'll call you when I'm at home." At approximately 9:17 p.m., LANDRAU-MARRERO stated, "Send me 200. I have 100 sold." LANDRAU-MARRERO explained that his customer wanted to see the product and that LANDRAU-MARRERO had explained to the customer "It's rock. It's not powder." BAEZ stated, "[I]t's loose." LANDRAU-MARRERO stated, "I'm going to give him what's mostly rock." At approximately 9:33 p.m., LANDRAU-MARRERO stated, "[S]he is parked at the corner." At approximately 9:52 p.m., BAEZ stated, "She left already." LANDRAU-MARRERO stated, "That's fine. She just called me." At approximately 9:31 p.m., stationary surveillance located at 158 Wellington Street in Fall River, Massachusetts, observed a dark colored sedan

---

[3] During the course of this investigation, DASILVA was intercepted on additional occasions receiving cocaine from BAEZ. For example, I believe that DASILVA received 140 grams of cocaine from BAEZ on October 14, 2019; that DASILVA received 56 grams of cocaine from BAEZ on November 22-25, 2019; and that DASILVA received 140 grams of cocaine from BAEZ on December 2-3, 2019.

conduct a three-point turn just prior to BAEZ's residence and park curbside.  At approximately

9:45 p.m., BAEZ was observed entering his Mercedes and departing the area with the dark colored

sedan following the Mercedes.  Surveillance followed the vehicles.  At approximately 9:51 p.m.,

both vehicles entered the parking lot of a gas station.  BAEZ was observed getting out of his vehicle

and getting into the passenger side of the dark colored sedan.  BAEZ then got out of the dark

colored sedan and entered the store.  The dark colored sedan departed the area.  I believe that

LANDRAU-MARRERO had a customer who was going to want "250" or 250 grams of cocaine

("I might have a 250 soon . . . He wants me to ask how much it costs"); that the cost of the cocaine

was $32.50/gram with payment at the time of delivery ("[T]wo and a half with the paper there");

that LANDRAU-MARRERO spoke to his customer; that the customer wanted "100" grams of

cocaine ("[H]e wants to buy 100"); that LANDRAU-MARRERO told BAEZ that he would take

"200" grams of cocaine ("Send me 200.  I have 100 sold"); that LANDRAU-MARRERO was

sending a female criminal associate to pick up the cocaine ("[S]he is parked at the corner"); that

LANDRAU-MARRERO and BAEZ were discussing the consistency of the cocaine when they

talked about "rock" and "loose"; and that LANDRAU-MARRERO's criminal associate received

the cocaine from BAEZ in the parking lot of the gas station.

> L.   *On October 23, 2019, BAEZ Received 250 Grams of Cocaine from ALFONSO*

67.    On October 23, 2019, at approximately 2:34 p.m**.,** BAEZ, who was using target

telephone # 6, spoke to ALFONSO, using telephone number (401) 585-3737.  ALFONSO asked,

"How much money you need?"   BAEZ stated, "I don't know, maybe like . . . 250 bucks."

ALFONSO stated, "I'll do it but you gotta give it back tho, I need it back."   BAEZ stated, "I'll

give it . . . the next day.  I'll give it right back to you . . . I might even have the tickets for you, you

know what I'm saying . . . reimburse you in a different way."  BAEZ stated, "Nah . . . I rather just

return it back to you." ALFONSO stated, "Yeah, because I get paid 36 . . . I get paid between 35 and 36 hours, you know what I mean?" BAEZ stated, "I'll give it back to you, that's fine." ALFONSO stated, "4:00 is cool?" BAEZ agreed. At approximately 6:49 p.m., an outgoing call was placed on target telephone # 6 to telephone number (401) 585-3737. BAEZ spoke to ALFONSO. ALFONSO stated, "I'll be there about 7:20." At approximately 7:51 p.m., BAEZ asked, "Where are you at?" ALFONSO stated, "I'm outside." At approximately 7:49 p.m., surveillance observed a black Cadillac Escalade, registered to Donald ALFONSO, arrive at BAEZ's residence. A male, believed to be ALFONSO, walked into the front driveway carrying a large backpack. At approximately 7:55 p.m., surveillance observed a Silver Lexus arrive at the residence. ALFONSO walked across the street to the Lexus and met with BAEZ. At approximately 8:00 p.m., surveillance observed BAEZ and ALFONSO walk towards BAEZ's residence. At approximately 8:20 p.m., surveillance observed ALFONSO walk from the vicinity of BAEZ's residence to the black Cadillac Escalade. I believe that BAEZ needed "250 bucks" or 250 grams of cocaine; that the price of the cocaine was "35 and 36," which was $35-$36/gram; that BAEZ was going to pay for the narcotics with "tickets," which was code for narcotics proceeds; that ALFONSO and BAEZ agreed to replace the cocaine with cocaine; and that ALFONSO delivered the cocaine to BAEZ.

> M. *On October 22-24, 2019, BAEZ Distributed Cocaine and Fentanyl to LANDRAU-MARRERO and Law Enforcement Attempted to Seize the Narcotics from LANDRAU-MARRERO*

68. Between October 22-24, 2019, BAEZ, using target telephone # 6, and LANDRAU-MARRERO, using telephone number (774) 770-1718, discussed that LANDRAU-MARRERO was going to get fentanyl and cocaine from BAEZ, which was going to be redistributed to customers of LANDRAU-MARRERO. On October 24, 2019, LANDRAU-MARRERO met with

BAEZ and took possession of the narcotics.  On October 24, 2019, a car stop was attempted on LANDRAU-MARRERO's vehicle.   As detailed below, LANDRAU-MARRERO and his associate Jamar fled the scene, disposed of the narcotics, and abandoned the vehicle that they had been using to transport the narcotics.  A small amount of a white powdery substance and a blue/purple substance were recovered from the vehicle.   Subsequent lab analysis revealed .583 grams of a substance that contained cocaine and fentanyl.

69.     On October 22, 2019, at approximately 2:47 p.m., BAEZ spoke to LANDRAU-MARRERO.  BAEZ asked, "[A]re you going to be ready for the stuff from 'abajo?'"  LANDRAU-MARRERO stated, "Of course . . . I'm counting my money right now so . . . I think I'm already ready."  LANDRAU-MARRERO stated, "I'mma count because I still like a thousand short on the down but I am going to have it in a little bit so either way . . . brother in law  . . . wanted two complete ones . . . he wants the white one . . . I'm waiting for him to text me."  LANDRAU-MARRERO stated, "I'm [going to] wait until tomorrow because I'll grab everybody's money and I'll go see you for both things at the same time."  I believe that LANDRAU-MARRERO was collecting money to purchase additional fentanyl from BAEZ ("are you going to be ready for the stuff from 'abajo'"); that LANDRAU-MARRERO had a customer who wanted "two" "white ones" or 200 grams of cocaine; and that LANDRAU-MARRERO was going to get the narcotics the following day.

70.     On October 23, 2019, at approximately 5:07 p.m., BAEZ stated, "[T]his guy didn't . . . didn't come very heavy/with a lot so . . . but I called him."  LANDRAU-MARRERO stated, "Let me know because the guy that wants two and a half told me . . . 'I'll wait'."  BAEZ asked, "What time are you coming down?"  LANDRAU-MARRERO stated, "Later . . . if you are ready today, I'll come down today."  BAEZ stated, "I told you that it already arrived.  I already have it."

LANDRAU-MARRERO stated, "[T]he guy that wants the 250, he keeps harassing me . . . I called him, and I told him, 'I'm waiting for my boy to see if he got it.'"  BAEZ stated, "I have the 250 for you.  That is there for sure."  BAEZ then stated, "I talked to him he said he is going to come down tomorrow . . . I don't know if he is going to come with one or if he is coming with a half . . . I just tell him 'Yo' and he already know . . . [h]e gives me whatever . . . I have the money for at least one and a half or two."  At approximately 7:55 p.m., an incoming call was received on target telephone # 6 from telephone number (774) 770-1718.  BAEZ spoke to LANDRAU-MARRERO. BAEZ asked, "So are you taking two tomorrow . . . [o]r are you just taking one?"  LANDRAU-MARRERO stated, "You bring me the full/complete 'lenta' tomorrow, and I'm going to grab maybe 100 of the white one . . . If brings me his money, then I grab 200 from you."  LANDRAU-MARRERO concluded, "I'm gonna call you tomorrow anyway for the 100 maybe a 200 and for the 'lenta.'"  BAEZ agreed. I believe that LANDRAU-MARRERO had a customer that wanted "two and a half"/"250"" which was a reference to 250 grams of cocaine; that BAEZ indicated that he had the cocaine ("I told you that it already arrived.  I already have it"); that LANDRAU-MARRERO was going to get the cocaine from BAEZ; that BAEZ was waiting for more fentanyl ("I talked to him he said he is going to come down tomorrow . . . I don't know if he is going to come with one or if he is coming with a half . . . I just tell him 'Yo' and he already know . . . [h]e gives me whatever . . . I have the money for at least one and a half or two"); and that LANDRAU-MARRERO was going to get a "full" unit of "lenta," or fentanyl, from BAEZ as well as "100" or "200" grams of the "white one," or cocaine; and that the delivery was going to occur the following day.

71.     On October 24, 2019, at approximately 8:46 p.m., BAEZ stated that he was heading home. LANDRAU-MARRERO stated, "I'm with my bodyguard . . . Jamar."  BAEZ stated, "I

thought you were coming with that girl so that you come, you know, safe." LANDRAU-MARRERO stated, "I'm safe . . . I'm with Jamar . . . in the car . . . that opens and closes . . . [t]he radio." LANDRAU-MARRERO stated, "I'll be there in five minutes." At approximately 8:58 p.m., LANDRAU-MARRERO stated, "I'm parking here at the corner." I believe that LANDRAU-MARRERO and Jamar (his bodyguard) were coming to meet BAEZ at 158 Wellington Street in Fall River to pick up cocaine and fentanyl; that BAEZ was concerned regarding the safe transportation of the narcotics ("I thought you were coming with that girl so that you come, you know, safe"); and that LANDRAU-MARREO had a hidden compartment in his vehicle to conceal the narcotics ("in the car . . . that opens and closes . . . [t]he radio").

72.     On October 24, 2019, at approximately 8:59 p.m., stationary surveillance at 158 Wellington Street in Fall River, Massachusetts, observed a black Chevrolet full size SUV park near the corner of Wellington Street. Two people were observed walking on the sidewalk and entering the parking lot of 158 Wellington Street (where Target Location # 2 is located). One of the people appeared to be carrying a small bag. At approximately 9:44 p.m., two people were observed, via stationary surveillance, exiting the lot of 158 Wellington Street (where Target Location # 2 is located) and walking back towards the black SUV. One of the people again appeared to be carrying a small bag. Surveillance followed the SUV as it departed the area. Surveillance observed that the vehicle was a Chevrolet Tahoe and had a Massachusetts license plate number 1RVF24, which is a vehicle known to be used by LANDRAU-MARRERO. At approximately 10:00 p.m., a Massachusetts State Trooper attempted a stop of the vehicle. The Tahoe fled the scene at a high rate of speed. The Tahoe struck another vehicle and was ultimately abandoned, and the occupants fled on foot. The Tahoe was towed from the scene. Officers conducted a search of the vehicle, pursuant to written consent from the registered owner, and found

white/off-white and light purple rocky powder in an automobile beverage holder.  Based on my training and experience, the intercepted calls, and subsequent laboratory analysis, I believe the white powder was cocaine and the purple powder was fentanyl.

73.     On October 24, 2019, at approximately 10:22 p.m., BAEZ spoke to Jamar.  BAEZ asked, "[W]hat happened with ChiChi."  Jamar explained, "[L]ike five state troopers chasing us."  BAEZ asked, "[A]nd the thing . . . did he give it to you?"  Jamar stated, "Yeah, I threw it out.  He told me to throw it out."  BAEZ asked, "You know where you threw it at?"  Jamar stated, "I know where but I don't know if we can grab/get it . . . they are in one of the sewers."  BAEZ stated, "[H]e's gonna have to pay . . . that's gonna be on him.  I can't take that loss alone."  Jamar stated, "I had to open the bag.  My tongue and my mouth are real numb."  BAEZ asked, "[W]hen did you guys get pulled over?"  Jamar stated, "Like two minutes from getting to New Bedford."  Jamar asked, "What do I do?"  BAEZ stated, "If they didn't see you, you're all set."  I believe that this conversation concerned the attempted stop of the Tahoe ("[L]ike five state troopers chasing us"); that BAEZ was concerned about the location of the fentanyl and cocaine ("[A]nd the thing . . . did he give it to you?"); that Jamar had thrown the narcotics from the Tahoe when they were being chased ("Yeah, I threw it out.  He told me to throw it out"); that Jamar had thrown the narcotics in one of the "sewers"; and that BAEZ was going to hold LANDRAU-MARRERO responsible for the cost of the lost narcotics ("[H]e's gonna have to pay . . . that's gonna be on him.  I can't take that loss alone").

74.     On December 6, 2019, at approximately 11:49 a.m., BAEZ and LANDRAU-MARRERO had a lengthy call, in part about the car chase.  LANDRAU-MARRERO stated, "I told Jamar, 'Yo, . . . look at this truck' . . . when I took off in the highway, the truck stayed behind me close . . . the truck started falling back . . . there were staties up ahead . . . I saw the fucker takes

off and gets behind me , , , [h]e turned the lights on so you know NASCAR . . . we reported the truck stolen." I believe that LANDRAU-MARRERO was confirming that he was in the vehicle on October 24, 2019 that fled from police.

> N.   *On October 25-26, 2019, BAEZ Delivered 20 Grams of Fentanyl to DASILVA*

75.   On October 25, 2019, at approximately 7:04 p.m., BAEZ, using target telephone # 6, spoke to DASILVA, using telephone number (857) 233-8684.  DASILVA asked, "Can you still get some of that . . . of the purple blue . . . the same strength like it was?"  BAEZ said, "Yes."  On October 26, 2019, at approximately 4:41 p.m., BAEZ asked, "How much are you going to want?"  DASILVA said, "Two . . . [b]ut it has to be the same thing . . . Tell the fucker that not to be stepping on it."  BAEZ stated, "I have them already."  At approximately 6:37 p.m., BAEZ stated, "I'm on my way there."  I believe that DASILVA wanted the same type of narcotics that she had previously bought from BAEZ ("Can you still get some of that . . . of the purple blue . . . the same strength like it was?"); that DASILVA wanted "two" fingers or 20 grams of fentanyl; and that BAEZ was headed to meet DASILVA to deliver the fentanyl.

> O.   *On November 26, 2019, BAEZ Stated that he Had 100 Grams of "Purple" Fentanyl*
> *and was Going to Distribute Fentanyl to LANDRAU-MARRERO*

76.   On November 26, 2019, at approximately 9:18 p.m., an outgoing call was placed on target telephone # 8, used by BAEZ, to telephone number (774) 770-1718, used by LANDRAU-MARRERO.  BAEZ stated, "I have of the purple if you want."  LANDRAU-MARRERO asked, "Do you have a lot?"  BAEZ answered, "Of the purple . . . I have 100 pesos."  BAEZ stated, "[M]y friend from Providence came and bought one . . .  finger, and he told me, 'That's good.'"  LANDRAU-MARRERO stated, "[B]ring me something."  BAEZ stated, "Tomorrow I will bring it down to you over there."  I believe that LANDRAU-MARRERO wanted narcotics from BAEZ; that BAEZ had "purple," which was reference to fentanyl ("I have of the purple if you want"); that

BAEZ had "100 pesos" or 100 grams of the "purple" fentanyl ("Of the purple . . . I have 100 pesos")"; that LANDRAU-MARRERO wanted some of the fentanyl ("[B]ring me something"); and that BAEZ was going to deliver purple fentanyl to LANDRAU-MARRERO the following day ("Tomorrow I will bring it down to you over there").

P.    On December 2, 2019, ALFONSO Told BAEZ to Distribute the Purple Fentanyl Faster

77.    On December 2, 2019, a series of conversations were intercepted regarding the purple fentanyl that confirmed that ALFONSO was the supplier of the purple fentanyl; showed that ALFONSO wanted BAEZ to distribute the purple fentanyl faster; and showed that after speaking to ALFONSO, BAEZ reached out, almost immediately, to LANDRAU-MARRERO in an effort to distribute 50 grams of the purple fentanyl.

78.    On December 2, 2019, at approximately 4:08 p.m., an outgoing call was placed on target telephone # 8 to telephone number (508) 493-3724.   BAEZ spoke to ALFONSO. ALFONSO stated, "We gotta get that kid back on the team. . . . [T]alk to that kid because  . . . we got the purple rain . . . we gotta keep shit rolling."  BAEZ stated, "It's gonna start picking up just give it . . . a couple of days."  I believe that this conversation concerned the purple fentanyl ("got the purple rain"); that BAEZ had received the purple fentanyl from ALFONSO; that ALFONSO wanted BAEZ to sell the purple fentanyl faster ("we gotta keep shit rolling"); and that BAEZ assured ALFONSO that he would be able to distribute the fentanyl soon ("It's gonna start picking up just give it . . . a couple of days").

79.    On December 2, 2019, at approximately 4:18 p.m., an outgoing call was placed on target telephone # 8 to telephone number (774) 770-1718.   BAEZ spoke to LANDRAU-MARRERO.   BAEZ asked, "[H]ow much would it take you to move 50?"   LANDRAU-MARRERO stated, "[F]our or five days."   BAEZ asked, "Are you gonna be home?"   LANDRAU-

MARRERO affirmed.  I believe that "50" is reference to 50 grams of fentanyl; that BAEZ wanted to know how long it would take LANDRAU-MARRERO to "move" or distribute the fentanyl; and that LANDRAU-MARRERO stated that it would be "four or five days" to distribute the narcotics. I believe that BAEZ needed help distributing the purple fentanyl quickly and that LANDRAU-MARRERO indicated that he would need four or five days to distribute "50" grams of the purple fentanyl.

> Q.   *On December 4, 2019, Mark ALFONSO Was Arrested and ALFONSO Was Implicated in a 128 Gram Cocaine Seizure*

80.     In December, 2019, a confidential source (the "CS"), who had provided information in the past, who was cooperating in the hope of a potential mitigation of criminal culpability, and who was willing to testify, provided information that telephone number (774) 309-5207 was a telephone being used by a large scale cocaine trafficker.  Independent investigation determined that telephone number (774) 309-5207 was being used by Donald Alfonso and that Donald Alfonso was a convicted narcotics trafficker, who was on federal probation, thereby corroborating, in part, the information provided by the CS.  A driver's license picture of Donald Alfonso was shown to the CS and the CS confirmed that ALFONSO was the user of said telephone. On December 4, 2019, the CS, at the direction of law enforcement, sent a text to telephone number (774) 309-5207 that stated, "[W]hat's the best numbers on a 100."  A text message was received by the CS directing the CS to contact telephone number (508) 493-3724 – one of the numbers used by ALFONSO, during this investigation.  The CS contacted telephone number (508) 493-3724, used by ALFONSO.  The CS received a text from ALFONSO stating, "34.5 . . . shit fire."  A telephone conversation occurred between the CS and ALFONSO, which was overheard by police, in which Alfonso agreed to deliver 128 grams of cocaine to Newport and that the cocaine would be delivered by his nephew.  A text was received by the CS providing the numbers "4455" as the

contact numbers for ALFONSO's nephew, later identified as Mark ALFONSO.  The CS received

a text message from telephone number (774) 309-4455 that stated, "Yo its D nephew I'm omw be

there in 30 mins."  At approximately 6:19 p.m., the CS spoke to ALFONSO, overheard by law

enforcement, during which ALFONSO stated that his nephew would be arriving alone in a black

colored Jeep with a MA registration.  The CS was aware of Mark Alfonso and stated that Mark

ALFONSO had been present in previous drug transactions with Donald ALFONSO.  At

approximately 6:12 p.m., Mark ALFONSO sent a text message to the CS that stated, "Be there is

15."  At approximately 6:15 p.m., Mark ALFONSO sent a text message to the CS that stated, "Not

even 10 mins."  At approximately 6:25 p.m., Mark ALFONSO sent a text message to the CS that

stated, "Pulling up."   Law enforcement observed a black colored Jeep Cherokee with

Massachusetts registration arrive in the area.  Police stopped the vehicle, and Mark ALFONSO

was the driver of the vehicle.  A search of the vehicle revealed a green colored, plastic wrapped

object in the center console of the vehicle, which field tested positive for the presence of cocaine.

I believe that Mark ALFONSO was delivering the cocaine on behalf of ALFONSO to a purchaser.[4]

Subsequent laboratory analysis revealed that the substance was, in fact, 127.9 grams of cocaine.

### R.   On December 9, 2019, LANDRAU-MARRERO Discussed Selling Guns

81.     On December 9, 2019, at approximately 6:18 p.m., two outgoing text messages

were sent on target telephone # 8 to telephone number (774) 634-4220, used by LANDRAU-

MARRERO.  The text messages stated, "Sell some toys . . . Sometimes we gotta sacrifice."  At

approximately 6:18 p.m., LANDRAU-MARRERO texted, "Iam trsyin salr few of them."  At

approximately 6:23 p.m., BAEZ sent a text message stating, "My boy looking for one."  At

---

[4] On August 12, 2019, Mark ALFONSO was intercepted on target telephone # 4, prior to a meeting with
BAEZ, at which I believe that Mark ALFONSO met with BAEZ at the direction of ALFONSO to receive narcotics
proceeds, receive narcotics, or deliver narcotics.

approximately 6:24 p.m., LANDRAU-MARRERO explained in a text, "Brand new body guard 380."   I believe that LANDRAU-MARRERO was trying to make some quick cash; that LANDRAU-MARRERO was considering selling a few "burn" or guns; that BAEZ's criminal associate was interested in buying a gun ("My boy looking for one"); and that LANDRAU-MARRERO had a new "380" ("Brand new body guard 380") available for sale.

> S.   *On December 13, 2019, Law Enforcement Seized 98 Grams of Cocaine, Which Was Intended for BAEZ, and Three Grams of Fentanyl from RIVERA*

82.   On December 13, 2019, BAEZ, who was using target telephone # 8, asked RIVERA, who was using telephone number (774) 320-9169, for 100 grams of cocaine; RIVERA and BAEZ discussed the price of the cocaine, which was going to be $32/gram or $34/gram; RIVERA went and picked up the cocaine from an unknown person; BAEZ was waiting for RIVERA; at approximately 8:30 p.m., RIVERA was stopped in route to deliver the 100 grams of cocaine to BAEZ; a subsequent search of the vehicle driven by RIVERA revealed 98 grams of cocaine and three grams of fentanyl, in a hidden compartment; and after the car stop, several conversations were intercepted between RIVERA and BAEZ regarding the stop and seizure of the vehicle, in which BAEZ inquired about the status of the cocaine.

83.   On December 13, 2019, at approximately 3:07 p.m., RIVERA asked, "[A]re you active?"  BAEZ stated, "Nah, that's what I was going to ask you."  RIVERA stated, "[T]here is some around there."  BAEZ asked, "At what number?"  RIVERA stated, "With the three two."  BAEZ asked, "Do you think you could bring me . . . about 100?"  RIVERA stated, "That's fine."  At approximately 4:34 p.m., RIVERA stated, "The thing is that . . . he gives it to me at three two when it's half a 'peso.'  He told me that if it's 100 pesos it's going to be a little more, you understand me?"  BAEZ asked, "But how much?"  RIVERA stated, "With the three four." I believe that BAEZ wanted "100" grams of cocaine from RIVERA; that the price of the cocaine was "three

two" or "three four," which is reference to $32/gram or $34/gram; and that RIVERA was going to deliver the cocaine.

84.     On December 13, 2019, at approximately 4:53 p.m., RIVERA stated, "I'm going to head to him to pick that up."  BAEZ stated, "Alright then, as soon you pick it up . . . go ahead that I'm in New Bedford . . . so I can head to my house when you're on your way here." At approximately 8:03 p.m., RIVERA stated, "I'm on my way there."   At approximately 8:30 p.m., RIVERA stated, "I'll be there in one minute."  Immediately thereafter, a car stop was conducted on a vehicle driven by RIVERA, specifically a KIA Sedona minivan, which was registered to John Cote.  An initial search of the vehicle did not reveal narcotics but did reveal an aftermarket box in place of where an airbag should have been, as well as aftermarket rails and welding.  Based on their experience, officers believed that the car had a hidden compartment, often used to conceal narcotics and/or guns.  RIVERA was told that the vehicle was going to be towed.  The vehicle was towed to the police station.  A narcotics K9 alerted to the presence of narcotics in the vehicle. Officers discovered a hidden compartment inside the vehicle that contained a bag that contained a block of white powder and two additional bags containing off-white powder.  Subsequent laboratory analysis revealed that the white powder was 98 grams of cocaine and the additional bags contained three grams of fentanyl.

85.     On December 13, 2019, at approximately 9:06 p.m., BAEZ told RIVERA, "[D]on't tell me you are the one that got pulled over there."  RIVERA stated, "Yes, it's me, so you come get me because they took the vehicle away from me."  At approximately 9:13 p.m., BAEZ asked, "[W]hat's wrong with the car that they are going to take it from you?"  RIVERA stated, "I don't know."  BAEZ stated, "[A]sk why.  You have rights."  BAEZ asked, "[A]re they undercover or regular?"  RIVERA stated, "One undercover and one regular . . . six (cars)."  BAEZ asked, "[W]hat

about the pump?  The pump was left inside there . . . the CD, did you leave it inside the radio?"
RIVERA stated, "[Y]es, yes, yes."  At approximately 10:37 p.m., an outgoing call was placed on
target telephone # 8 to telephone number (401) 919-3014, which was believed to be the telephone
of an associate of RIVERA that was being used by RIVERA.    BAEZ spoke to RIVERA.
RIVERA stated, "[T]hey called the guy; they found everything . . . they told him to go and pick it
up . . . the vehicle."  BAEZ stated, "No . . . he can't . . . he will be arrested right there . . . the good
thing about this is that they did not have a warrant to check it, and he did not give them permission."
I believe that BAEZ wanted RIVERA to contest the seizure of the vehicle; that BAEZ was
inquiring whether the police had found the narcotics inside the hidden compartment ("[W]hat
about the pump?  The pump was left inside there . . . the CD, did you leave it inside the radio");
that RIVERA affirmed that the police had found the cocaine; that RIVERA was informing BAEZ
that the police had contacted John Cote, the owner of the vehicle; and that BAEZ was emphatic
that Cote would be arrested if he went to claim the vehicle because BAEZ knew that the vehicle
contained narcotics.

> T.    *On December 15, 2019, BAEZ Distributed 60 Grams of Fentanyl to LANDRAU-*
> *MARRERO and Planned to Have 160 Grams of Fentanyl for Distribution*

86.    On December 15, 2019, at approximately 2:58 p.m. BAEZ spoke to LANDRAU-
MARRERO.  BAEZ asked, "You are sending that with her, right?"  LANDRAU-MARRERO
affirmed, "I was going to give the money to her."  BAEZ stated, "I am going to give her . . . I am
going to give you six zero cause I don't want to keep/stay with anything . . . I will send it to you."
At approximately 3:00 p.m., LANDRAU-MARRERO sent a text message to BAEZ that stated, "I
can trow 100 on that."  At approximately 3:10 p.m., BAEZ sent two text messages which stated,
"Yea" and "Is not touch you'll see."  I believe that LANDRAU-MARRERO had a female criminal
associate; that LANDRAU-MARRERO was sending the woman to BAEZ to deliver "money"

which was payment for narcotics previously received; that BAEZ was going to give the woman "six zero" or 60 grams of fentanyl that he had at his location because BAEZ was afraid that he was going to be searched as a result of the RIVERA seizure ("I don't want to keep/stay with anything . . . I will send it to you"); that LANDRAU-MARRERO wanted to know whether he could add 100 grams of cut to the 60 grams of fentanyl; that BAEZ affirmed that LANDRAU-MARRERO could add the 100 grams of cut for a total of 160 grams of fentanyl for distribution ("I can trow 100 on that"); that BAEZ explained that the fentanyl had not been touched or cut ("Is not touch you'll see"); and that interceptions were received that showed that LANDRAU-MARRERO met up with the female criminal associate who had the fentanyl after she left BAEZ.

### III.   The EL BELLO Wiretap Interceptions

87.    Phase Three of the investigation focused on EL BELLO and his immediate narcotics trafficking organization, spanned from August 8, 2019, to October 5, 2019, and February 5, 2020, to March 24, 2020, and included the interception of target telephone # 3, target telephone # 5, target telephone # 9, target telephone # 10, and target telephone # 13, used by EL BELLO, and target telephone # 11, used by ORTEGA.  The investigation revealed that EL BELLO, CALDERON, ORTEGA, MARINEZ-MATOS, MEJIA-ALVAREZ, and SANZ, who are charged in this Complaint, and others, were criminal associates who actively participated in the distribution of fentanyl and cocaine.  The investigation revealed that EL BELLO was a large scale fentanyl and cocaine distributor; that ORTEGA, MEJIA-ALVAREZ, and CALDERON assisted EL BELLO in the distribution of narcotics; that SANZ was a fentanyl customer of the organization; and that MARINEZ-MATOS was a source of supply for the organization.  Interceptions revealed that EL BELLO distributed multi-kilogram quantities of cocaine and fentanyl; that CALDERON distributed in excess of 100 grams of cocaine; that ORTEGA distributed in excess of a kilogram

of fentanyl and 500 grams of cocaine; that MARINEZ-MATOS was the source of supply of 990

grams of fentanyl; that MEJIA-ALVAREZ was a fentanyl distributor who was supplied by EL

BELLO and had alternate sources of supply and who distributed in excess of 170 grams of

fentanyl; and that SANZ received and distributed in excess of 300 grams of fentanyl.  One seizure

of narcotics occurred during this portion of the investigation, specifically on March 21, 2020, when

990.9 grams of fentanyl were seized from MARINEZ-MATOS, implicating EL BELLO and

ORTEGA.   Additionally, on April 15, 2020, after the termination of the wiretaps, approximately

120 grams of fentanyl were seized from MEJIA-ALVAREZ.  The following are examples of the

intercepted transactions in this matter.

> A. *On September 20-24, 2019, EL BELLO Received Narcotics and Distributed One*
> *Kilogram of Cocaine to an Unknown Male, Using Telephone Number (401) 390-*
> *1186 ("UM1186")*

88.     On September 20, 2019, EL BELLO, using target telephone # 3 and target

telephone # 5, contacted a previously unknown number and used a code ("I'm calling on behalf of

Lucy"); met with an unknown criminal associate; and received a multi-kilogram quantity of

cocaine.  EL BELLO then distributed a kilogram of cocaine to UM1186 and received payment for

the cocaine from UM1186.

89.     On September 20, 2019, at approximately 7:06 p.m., EL BELLO spoke to an

unknown male, using telephone number (857) 261-1428 ("UM1428").  UM1428 stated, "I'm

calling on behalf of Lucy."  EL BELLO stated, "I'm here in Providence . . . I'm going to send you

an address."  At approximately 8:21 p.m., EL BELLO asked, "Is that you the one who is parking

in the black one?"  UM1428 affirmed.  EL BELLO stated, "I'm coming there."  I believe that

UM1428 is a criminal associate of EL BELLO; that the phrase, "I'm calling on behalf of Lucy"

was code used by the organization as a way of introduction to conduct an illegal transaction; that

EL BELLO was meeting with UM1428 at 20 Barrows Street in Providence, Rhode Island; and that

EL BELLO was receiving a multi-kilogram quantity of cocaine.

90.     On September 22, 2019, at approximately 2:57 p.m., EL BELLO spoke to an

unknown Male, using telephone number (401) 390- 1186 ("UM1186").    EL BELLO stated,

"There's some women/girls around there."  UM1186 asked, "[H]ow old are they?"  EL BELLO

stated, "32 years old."  UM1186 stated, "Let me make a call, and I'll call you back."   At

approximately 5:35 p.m., EL BELLO spoke to UM1186.  EL BELLO stated, "[W]hat I told you

earlier."  UM1186 asked, "Are they blonde?"  EL BELLO stated, "Yes, yes, it is good."  On

September 23, 2019, at approximately 6:07 p.m., EL BELLO stated, "[L]et me send you this guy

there."  UM1186 stated, "[L]et's do it."  At approximately 7:59 p.m., EL BELLO stated, "You can

come to my house, so you know . . . I am going to send you the address."  At approximately 8:19

p.m., UM1186 stated, "Outside."  EL BELLO stated, "All right.  I am coming out."  On September

24, 2019, at approximately 12:17 p.m., EL BELLO stated, "You missed a line/stripe."  UM1186

asked, "One?"  EL BELLO stated, "Yes, a package came of nine."  UM1186 explained, "Yes,

there was  . . . one of nine, one of 11 . . . and another one of 10 with the one that had the seven and

something stapled there."  EL BELLO stated, "No, there wasn't any of 11."  UM1186 stated, "Let

me check . . . I'll call you back."   I believe that EL BELLO had some kilograms of cocaine

available for delivery ("There's some women/girls around there"); that the price of the cocaine

was $32,000 per kilogram ("32 years old"); that EL BELLO met with UM1186 in the vicinity of

49 Aldine Street in Providence Rhode Island, based on precise location data, which was the

residence of EL BELLO and ORTEGA; that EL BELLO gave UM1186 a kilogram of cocaine;

that UM1186 paid EL BELLO $32,000 for the kilogram of cocaine ("there was  . . . one of nine,

one of 11 . . . and another one of 10 with the one that had the seven and something stapled there");

and that one of the bundles of money was short ("You missed a line/stripe . . . a package came of nine").

> **B.**   *From August-December, 2019, CALDERON Delivered Cocaine to Low Level Customers of the Organization*

91.   On August 11, 2019, EL BELLO contacted RIVERA in order to start distributing cocaine to low level cocaine customers of the organization.  From August 2019 to December 2019, EL BELLO and/or CALDERON contacted low level cocaine customers of the organization, previously serviced by RIVERA, and arranged for delivery of cocaine; and CALDERON delivered the cocaine.

92.   On August 11, 2019, at approximately 9:44 p.m., EL BELLO, using target telephone # 3, spoke to RIVERA, using telephone number (508) 287-5559.  EL BELLO stated, "I want to see if I do a small thing in the countryside."  RIVERA stated, "Of course.  Which one is that?  From the blonde one?"  EL BELLO stated, "Yes, the blonde one."  EL BELLO explained, "I am saying that I am going to do a small thing over there towards Fall River."  EL BELLO stated, "La Cumbia told me that you have some people."  RIVERA stated, "I let that go."  EL BELLO asked RIVERA, "Do you have the numbers?"  RIVERA stated, "I will get you the numbers."  EL BELLO explained, "I have a nephew that is not doing anything."  At approximately 10:12 p.m., RIVERA stated, "I'll send you the numbers through WhatsApp . . . It was like ten numbers that were there . . . They are there with all the names, the same way I had them."  I believe that EL BELLO was taking over the Fall River cocaine distribution of the organization; that CALDERON was going to service the region ("I have a nephew that is not doing anything"); and that RIVERA sent the names and telephone numbers of the organization's customers to EL BELLO ("I'll send you the numbers through WhatsApp . . . It was like ten numbers that were there . . . They are there with all the names, the same way I had them").

93.     In mid-August 2020, EL BELLO contacted several of the low level cocaine customers of the organization and made arrangements to start supplying them with cocaine and to have CALDERON deliver the cocaine.  For example, on August 15, 2019, EL BELLO spoke to Velozo.  Velozo asked, "How long?"  EL BELLO stated, "25 minutes."  Velozo stated, "Alright, call me."  Toll records for CALDERON, reveal that at approximately 6:28 p.m., an incoming call was received from EL BELLO.  At approximately 6:31 p.m., CALDERON placed a call to Velozo.  Toll records showed that at approximately 6:48 p.m. and 7:02 p.m., CALDERON contacted Velozo.  At approximately 7:00 p.m., surveillance observed a vehicle, known to be used by Velozo, parked on Irving Avenue in Somerset, Massachusetts.  Surveillance observed a gray Volkswagen Passat driven by CALDERON pull up behind Velozo's vehicle.  Velozo exited his vehicle, walked up to the driver's side door of the Passat, leaned into the window of the Passat, walked away from the vehicle, and departed the area.  I believe that EL BELLO agreed to deliver cocaine to Velozo, and contacted CALDERON and instructed him to deliver cocaine to Velozo; that CALDERON contacted Velozo to arrange the time of the delivery; and that CALDERON met with Velozo, as observed by surveillance, and delivered the cocaine to Velozo.

94.     A similar transaction occurred on August 17, 2019.  EL BELLO spoke to Ahern.  Ahern asked EL BELLO, "[A]re you back in business?"  EL BELLO stated, "Yeah."  Ahern asked, "[A]re you available at all tonight?"  EL BELLO said, "Yeah, till 8:00."  Ahern stated, "I live in Pawtucket . . . Where are you?"  EL BELLO stated, "Fall River."  Ahern stated, "I'm heading over that way . . . give you a call . . .  I can meet up with you."  At approximately 4:06 p.m., Ahern asked, "[D]o you sell 40 . . . 40 pieces?"  EL BELLO said "Yes."  Ahern stated, "I'm gonna take two of those."  EL BELLO agreed.  At approximately 4:27 p.m., EL BELLO stated, "My buddy gonna call you . . . my runner . . . he gonna call you right now."  Ahern stated, "[H]ave someone

call me, and we'll set up a place to meet." Toll records for CALDERON's telephone show contact with Ahern at approximately 4:29 p.m. and 4:47 p.m. At approximately 4:48 p.m., EL BELLO spoke to Ahern. Ahern stated, "I just talked to your driver, I'm waiting for him . . . each piece is 40, right . . . so does he know I need two." EL BELLO affirmed. Ahern stated, "I know a couple of people from back in the day too that will be anxious to hear from you so I'll pass your number on." EL BELLO stated, "Alright." I believe that EL BELLO was sending the "runner," or CALDERON, to meet with Ahern and deliver "two" units of cocaine; that CALDERON communicated with EL BELLO and Ahern; and that CALDERON delivered cocaine to Ahern.

95.     On September 7, 2019, at approximately 5:53 p.m., EL BELLO, using target telephone # 5, which was being intercepted, spoke to CALDERON. EL BELLO stated, "Sheila called that she wants two or three." CALDERON stated, "I'll stop by there." At approximately 6:27 p.m., EL BELLO asked, "Are you almost at Sheila's?" CALDERON stated, "I'll be there in like 15 minutes." At approximately 7:19 p.m., EL BELLO asked, "How much do you have left?" CALDERON stated, "[F]ive." At approximately 7:49 p.m., CALDERON asked, "Christine, you give her one for 35?" EL BELLO affirmed. I believe that EL BELLO was informing CALDERON that "Sheila" wanted "two or three" units of narcotics; that CALDERON was going to deliver the narcotics to "Sheila"; that CALDERON had "five" units of narcotics left; and that CALDERON gave Christine "one" unit of narcotics for "35" or one gram of cocaine for $35.

96.     On September 10, 2019, at approximately 7:34 p.m., EL BELLO spoke to CALDERON. EL BELLO stated, "I am going to buy myself another car and insure under another person's name. And we also have to look for a guy . . . What you have to do is go to the countryside from 10:00 in the morning . . . that you are going to earn 1,000 to 2,000 pesos per week." CALDERON stated, "[T]hese people do not call you early." EL BELLO stated, "Of course they

will . . . after that countryside is established, all you need to do is get a guy . . . and you pay him 1,000 something and then you earn half from the other with me just sitting at your house."  I believe that EL BELLO wants a new vehicle to transport narcotics ("I am going to buy myself another car and insure under another person's name"); that EL BELLO wanted CALDERON to expand the business in the "countryside" or Fall River ("what you have to do is go to the countryside from 10:00 in the morning , , , that you are going to earn 1,000 to 2,000 pesos per week"); and that once the business was expanded CALDERON could hire a worker to distribute the narcotics ("after that countryside is established, all you need to do is get a guy . . . and you pay him 1,000 something and then you earn half from the other with me just sitting at your house").

97.     The following are examples of conversations that occurred between EL BELLO and CALDERON showing CALDERON's distribution activities.  On September 9, 2019, at approximately 10:15 p.m., EL BELLO asked, "How many did you get rid of today."  CALDERON stated, "I think only four . . . Domingo twice, Cheryl and Christine, and the other one . . . no five." On September 13, 2019, at approximately 6:26 p.m., EL BELLO asked CALDERON, "Do you still have alot left?"  CALDERON stated, "Two."  EL BELLO asked, "Should I bring you some?" CALDERON affirmed.  On September 19, 2019, at approximately 6:29 p.m., CALDERON stated, "I only have four left . . . I just arrived here [a]nd Donna and Domingo called.  On September 25, 2019, at approximately 8:56 p.m., EL BELLO asked, "[W]hat happened in the countryside today?" CALDERON stated, "Domingo, Christine, and Rick's woman . . . I have ten stored at the house . . . I have like 22 left, something like that."  On September 22, 2019, at approximately 2:54 p.m., an incoming call was received on target telephone # 5 from telephone number (857) 251-6502.  EL BELLO spoke to CALDERON.  EL BELLO asked, "[H]ow many things do you have left?" CALDERON stated, "I would say 34."  On September 30, 2019, at approximately 6:28 p.m., EL

BELLO told CALDERON, "Go to . . . the 13, Brian . . . he wants two . . . he wants three . . . [h]ead over there at once."   On October 1, 2019, at approximately 4:46 p.m., EL BELLO told CALDERON, "13 wants two or three."   CALDERON stated, "I will call him now when I pass by there."   On October 2, 2019, at approximately 9:54 p.m., an outgoing call was placed on target telephone # 5 to telephone number (857) 251-6502.   EL BELLO spoke to CALDERON.   EL BELLO stated, "It was eight?"   CALDERON affirmed.   CALDERON stated, "Brian . . . he is telling me to talk to you . . . that supposedly after he has 10 points, he gets one."   EL BELLO stated, "Yes, that is the way it is."   On October 4, 2019, at approximately 7:13 p.m., an outgoing call was placed on target telephone # 5 to telephone number (857) 251-6502.   EL BELLO spoke to CALDERON.   CALDERON stated, "Today I got rid of nine and I still have to see Domingo . . . like 12, 13 are going out."   I believe that each of these calls concerned the amount of cocaine that CALDERON had available for distribution or had distributed on each individual day and the persons to whom CALDERON was distributing cocaine.

98.    Toll records show that CALDERON's cocaine distribution activities continued from at least early October 2019 until the end of December, 2019.   Toll records show that during that period of time there were the following:  398 contacts between CALDERON's telephone and Steven Velozo; 242 contacts between CALDERON's telephone and Brian Costa, a known cocaine customer; 196 contacts between CALDERON's telephone and John Ahern, a known cocaine customer; 67 contacts between CALDERON's telephone and Donna, a known cocaine customer; and 35 contacts between CALDERON's telephone and Jay, a known cocaine customer.  I believe that CALDERON continued to be an active cocaine distributor through December 31, 2019.

C. *On February 5-8, 2020, Calls Established that MEJIA-ALVAREZ Was a Fentanyl Distributor for EL BELLO*

99.    On February 5-8, 2020, as detailed below, MEJIA-ALVAREZ, using telephone

number (401) 497-5734, worked with EL BELLO, using target telephone # 9, to distribute fentanyl; that at times EL BELLO received information about fentanyl sources of supply from MEJIA-ALVAREZ: and that, at times, MEJIA-ALVAREZ received fentanyl from EL BELLO.

100.    On February 5, 2020, at approximately 9:56 p.m., EL BELLO spoke to MEJIA-ALVAREZ.  EL BELLO stated, "Move those people out because they are about to give me more of that stuff."   MEJIA-ALVAREZ stated, "Yes, I'm going to tell them . . . so they get rid of that at once."  I believe that EL BELLO wanted MEJIA-ALVAREZ to step up distribution of the narcotics that they had because EL BELLO was expecting a new shipment of narcotics ("Move those people out because they are about to give me more of that stuff") and that MEJIA-ALVAREZ agreed ("Yes, I'm going to tell them . . . so they get rid of that at once).

101.    On February 7, 2020, at approximately 3:31 p.m., EL BELLO spoke to MEJIA-ALVAREZ.  EL BELLO stated, "[Y]ou have to make him something to eat."  MEJIA-ALVAREZ stated, "I told you, I gave him twenty five 'panes' for him to eat there in the meantime . . . he had a thing in another bakery and is getting rid of that."  EL BELLO stated, "I was just checking . . . the one that you took the photo to yesterday, he has not said anything yet?"  MEJIA-ALVAREZ stated, "I am going to hit him up now."  EL BELLO stated, "Yeah because that is 'criminal.'" MEJIA-ALVAREZ stated, "Yeah.  Just one person gave him a complaint.  Just one out of everyone.  But there is always going to be people like that."  I believe that MEJIA-ALVAREZ distributed "25 panes" or 25 grams of fentanyl to a criminal associate; that EL BELLO had received a new batch of narcotics; that MEJIA-ALVAREZ had distributed several "photos" or samples of the narcotics; and that most people had reported that the quality of the narcotics was good ("Yeah.  Just one person gave him a complaint.  Just one out of everyone.  But there is always going to be people like that").

102.     On February 8, 2020, MEJIA-ALVAREZ stated, "[D]o you remember the guy that I told you that was there that wanted to give me stuff . . . [h]e is hitting me up . . . to go pick up a photo and that the thing is nice, nice, nice."   EL BELLO asked, "[H]ow much?"   MEJIA-ALVAREZ stated, "I told him you were giving me something, that you were giving it/putting it for me at 48.  He said, 'We will negotiate.'"   I believe that MEJIA-ALVAREZ had a criminal associate who had access to fentanyl which was high quality ("do you remember the guy that I told you that was there that wanted to give me stuff . . . [h]e is hitting me up . . . to go pick up a photo and that the thing is nice, nice, nice"); that EL BELLO wanted to know the price of the fentanyl; that the unknown source of supply was willing to negotiate the price ("we will negotiate").

> **D.  On February 8-12, 2019, MEJIA-ALVAREZ Received 100 Grams of Fentanyl from EL BELLO, Distributed the Fentanyl to a Customer, and Got 20 Grams of Bad Fentanyl Returned from a Prior Transaction**

103.     On February 8-12, 2020, MEJIA-ALVAREZ, using telephone number (401) 497-5734, received 100 grams of fentanyl from EL BELLO, who was using target telephone # 9; delivered the fentanyl to an unknown customer of MEJIA-ALVAREZ; and received 20 grams of bad fentanyl back from the customer, which MEJIA-ALVAREZ returned to EL BELLO.

104.     On February 8, 2020, at approximately 7:25 p.m., MEJIA-ALVAREZ asked EL BELLO, "[D]o you still have some of the chocolate you had . . . and is it nice?"   EL BELLO affirmed and stated, "[I]t is nice . . . It is coming straight from the 'parceros' . . . I will give it at 38 . . . whole . . . if you take a half or one, but little things like 100  . . . that would be a mess."   At approximately 7:38 p.m., MEJIA-ALVAREZ asked, "If they take 100 . . . how much can we put it/give it for?"   EL BELLO stated, "55 or 60."   At approximately 7:43 p.m., MEJIA-ALVAREZ stated, "I told him/her 55 . . . if it is 100, I will give it/put it at 55 . . . if it's a half and up, I will

give it/put it at 45."  I believe that EL BELLO had a large stash of fentanyl at that time ("Yeah,

because I have a lot of that stuff here, you know that"); that MEJIA-ALVAREZ had a fentanyl

customer that was interested in buying "chocolates" or fentanyl from EL BELLO ("do you still

have some of the chocolate you had"); that EL BELLO was willing to sell the fentanyl to MEJIA-

ALVAREZ for $38,000 for a "whole" kilogram ("I will give it at 38 . .  whole . . . if you take a

half or one, but little things like 100  . . . that would be a mess"); that EL BELLO would sell the

fentanyl for $55 or $60 a gram for 100 grams of fentanyl ("If they take 100 . . . how much can we

put it/give it for?"  EL BELLO stated, "55 or 60"); and that MEJIA-ALVAREZ had communicated

with his customer regarding the terms of sale of the narcotics ("I told him/her 55 . . . if it is 100, I

will give it/put it at 55 . . . if it's a half and up, I will give it/put it at 45").

105.     On February 11, 2020, at approximately 11:53 a.m., EL BELLO asked MEJIA-

ALVAREZ, "[W]hat happened?  Wasn't somebody supposed to grab 100 pesos yesterday?"

MEJIA-ALVAREZ replied, "[Y]es, he was hitting me up yesterday . . . he told me that he was

waiting for a guy that was coming from New Hampshire to bring him some money to know how

much he was going to grab."  EL BELLO explained, "It's so I can have it ready so we don't have

to rush things."  At approximately 2:38 p.m., MEJIA-ALVAREZ stated, "I'm here in the house

and I was going to go over there to bring you something and from there I was going to go up there."

EL BELLO stated, "Alright, I . . . can leave here at once, I'll pass by there."   EL BELLO stated,

"You have the key there."  At approximately 3:40 p.m., MEJIA-ALVAREZ stated, "I am on my

way already."  At approximately 4:10 p.m., stationary surveillance observed MEJIA-ALVAREZ

arrive at 49 Aldine Street and use a key to enter the residence.  Approximately 10-12 minutes later,

MEJIA-ALVAREZ exited the residence, went towards his vehicle, and then re-entered the

residence with his wife and child.  At approximately 5:05 p.m., MEJIA-ALVAREZ and his two

family members departed the residence and the area.  Surveillance observed that the license plate of the vehicle used by MEJIA-ALVAREZ was registered to Yuliana Robles, the wife of MEJIA-ALVAREZ.  I believe that MEJIA-ALVAREZ had a fentanyl customer who wanted 100 grams of fentanyl ("Wasn't somebody supposed to grab 100 pesos yesterday?"); that MEJIA-ALVAREZ had been communicating with his narcotics customer who was collecting money to pay for the narcotics ("he was hitting me up yesterday . . . he told me that he was waiting for a guy that was coming from New Hampshire to bring him some money to know how much he was going to grab"); that EL BELLO wanted some advance notice so he could be ready with the fentanyl ("It's so I can have it ready so we don't have to rush things"); and that MEJIA-ALVAREZ went to the residence of EL BELLO at 49 Aldine Street in Providence, Rhode Island, based on surveillance, to pick up fentanyl for distribution, prior to making the delivery of fentanyl to his customer ("I'm here in the house and I was going to go over there to bring you something and from there I was going to go up there").

106.    On February 12, 2020, at approximately 1:09 p.m., MEJIA-ALVAREZ told EL BELLO, "I am going to pass by there in a bit to bring you something."  EL BELLO asked, "[W]hat did they tell you?"  MEJIA-ALVAREZ stated, "[D]o you remember the 20 . . . the last ones . . . [t]hey also gave it back to me."  EL BELLO stated, "That is fine.  It will be fixed."  At approximately 3:33 p.m., MEJIA-ALVAREZ asked, "Are you home?"  EL BELLO said, "Yes."  MEJIA-ALVAREZ stated, "I am going over there."  I believe that MEJIA-ALVAREZ was going to 49 Aldine Street to meet with EL BELLO, to drop off 20 grams of bad fentanyl, and to drop off narcotics proceeds.  Stationary surveillance observed MEJIA-ALVAREZ walk to the front door of 49 Aldine Street.  At approximately 6:37 p.m., MEJIA-ALVAREZ was observed leaving 49 Aldine Street and departing the area.

   E.   *February 11-12, 2020, EL BELLO and ORTEGA Received 250 Grams of Fentanyl*
        *from Homerito and Delivered 100 Grams of Fentanyl to SANZ*

107.    On February 11, 2020, as detailed below, SANZ, using telephone number (857)

300-9131, ordered 100 grams of fentanyl from EL BELLO, who was using target telephone # 9;

EL BELLO instructed ORTEGA, using target telephone # 11, to contact Homerito and borrow 250

grams of fentanyl from Homerito; ORTEGA contacted and met with Homerito to receive the

fentanyl; on February 12, 2020, ORTEGA contacted SANZ to arrange the delivery of the 100

grams of fentanyl; and then ORTEGA delivered 100 grams of fentanyl to SANZ in the black

Buick, which has a hidden compartment and was used by the organization to distribute narcotics.

108.    On February 11, 2020, at approximately 3:57 p.m., EL BELLO spoke to SANZ.

SANZ stated, "Let's leave it for tomorrow early, what do you think . . . [D]o you have anything

new or you have the same thing?"  EL BELLO stated, "No, we have something ne [sic]. . . that's

why I was going to send you a photo of something they are saying is good around there."  SANZ

stated, "[W]hat you gave me wasn't that bad, it was working well . . . [b]ut if that one is a little

better . . . the price is good."  EL BELLO stated, "You want some of that same one and do I send

you a photo of the other one so you check it."  SANZ stated, "But if the other one is better send

me the other one."  EL BELLO stated, "Alright, I'm going to send you the other one."  SANZ

stated, "So send me 100 pesos then."  I believe that SANZ wanted a 100 grams of fentanyl; that

SANZ wanted to know whether the narcotics were the old batch that he had received from EL

BELLO before or a new batch of narcotics ("Do you have anything new or you have the same

thing?"); that EL BELLO had a previous batch of fentanyl available that he had distributed to

SANZ on prior occasions as well as a new batch of fentanyl ("You want some of that same one

and do I send you a photo of the other one so you check it?"); that EL BELLO offered to give

SANZ a "photo" or sample of the new batch of fentanyl ("what you gave me wasn't that bad, it

was working well . . . [b]ut if that one is a little better . . . the price is good"); and that SANZ elected to take fentanyl from the new batch based on EL BELLO's statement that the quality of the fentanyl was better ("but if the other one is better send me the other one").

109.    On February 11, 2020, at approximately 5:19 p.m., EL BELLO spoke to ORTEGA. EL BELLO stated, "[C]all this guy so he lends you 250 pesos because we have to go see Primo's brother with 100 pesos."  ORTEGA asked, "Who?"  EL BELLO stated, "Homerito . . . go to Homerito to get/pick up 250 pesos."  Toll records for target telephone # 11, used by ORTEGA, revealed that at approximately 5:29 p.m., an outgoing call was placed to telephone number (401) 256-8089, used by Homerito.  At approximately 5:53 p.m., an incoming call was received on target telephone # 11 from telephone number (401) 256-8089, used by Homerito.  At approximately 6:02 p.m., an outgoing text message was sent on target telephone # 11 to telephone number (401) 256-8089, used by Homerito.  Records also showed at 9:17 p.m., an outgoing text message was sent on target telephone # 11 to (857) 300-9131, used by SANZ.  I believe that EL BELLO was directing ORTEGA to contact Homerito and borrow 250 grams of fentanyl from Homerito; that 100 grams of the fentanyl was going to be delivered to SANZ ("[C]all this guy so he lends you 250 pesos because we have to go see Primo's brother with 100 pesos . . .  Homerito"); that ORTEGA contacted Homerito, as evidenced by toll records; that ORTEGA went and met with Homerito to receive the 250 grams of fentanyl, also as evidenced by toll records; and that ORTEGA attempted to contact SANZ, for the delivery the following day.

110.    On February 12, 2020, at approximately 11:02 a.m., EL BELLO spoke to ORTEGA.  EL BELLO stated, "Call Primo's brother."  ORTEGA stated, "I already called him and he does not answer me."  EL BELLO stated, "Keep calling him."  ORTEGA affirmed.  At approximately 11:48 a.m., toll records revealed an incoming call was received on target telephone

# 11 from (857) 300-9131, used by SANZ. At approximately 12:03 p.m., ORTEGA asked EL BELLO, "Are you at home?" EL BELLO stated, "Yes." ORTEGA stated, "Take out the cars to go see you." EL BELLO affirmed. At approximately 12:11 p.m., stationary surveillance at 49 Aldine Street observed EL BELLO move two vehicles out of the driveway and park them on the street; at approximately 12:20 p.m., ORTEGA walked up the driveway; and at approximately 12:28 p.m., the Black Buick, which was used repeatedly by the organization to transport narcotics, backed out of the driveway. At approximately 1:22 p.m. and 1:32 p.m., two outgoing calls were placed on target telephone # 11 to (857) 300-9131, used by SANZ. At approximately 2:53 p.m., EL BELLO spoke to ORTEGA. ORTEGA stated, "I thought you were going to leave the cars outside." EL BELLO explained that they had been cutting the trees and told ORTEGA, "[L]eave them outside there, I will bring them in later." I believe that "Primo's brother" was SANZ; that ORTEGA had spoken to SANZ and arranged to meet; that ORTEGA went to 49 Aldine Street to pick up the black Buick, used to transport narcotics; that ORTEGA travelled to SANZ to deliver 100 grams of fentanyl to SANZ; and that ORTEGA returned the organization's narcotics transportation vehicle to 49 Aldine Street after the fentanyl delivery.

F. *On March 10-11, 2019, EL BELLO and ORTEGA Delivered 100 Grams of Fentanyl to SANZ*

111. On March 10-11, 2020, as detailed below, EL BELLO, using target telephone # 13, agreed to distribute fentanyl to SANZ, using telephone number (857) 300-9131; EL BELLO tasked ORTEGA, using target telephone # 11, with contacting SANZ and arranging for the delivery of the fentanyl; ORTEGA travelled to 49 Aldine Street and retrieved the fentanyl, as observed on surveillance; ORTEGA travelled in the black Buick to Sonoma Street, as observed by surveillance, and met with a female criminal associate of SANZ; and ORTEGA delivered fentanyl to the criminal associate of SANZ.

112.     On March 10, 2020, at approximately 11:42 a.m., EL BELLO asked SANZ, "Do you want me to come up . . . with the same 100 pesos?"  SANZ stated, "No, no, not 100 pesos. They gave me a few complaints from that last work."  EL BELLO stated, "I'm going to bring you from another one . . . because that one was from one that Kiki had."  SANZ stated, "No, I'm fine for now."  On March 11, 2020, at approximately 3:56 p.m., EL BELLO told ORTEGA, "Come over here because Primo's brother called."  ORTEGA agreed.  EL BELLO stated, "You call him and tell him at what time.  I'm going to start taking the stuff out."  At approximately 4:00 p.m., ORTEGA spoke to SANZ.  SANZ stated, "All good! So you bring up the thing you told me."  ORTEGA stated, "Alright, but let's wait for the thing (traffic) to go down a bit.  So as not to take too long . . . The same place as always?"  SANZ affirmed.  At approximately 5:25 p.m., stationary surveillance observed the Black Buick pull into the driveway at 49 Aldine Street in Providence, Rhode Island; ORTEGA got out of the vehicle and walked towards the house; at approximately 6:10 p.m., stationary surveillance observed ORTEGA get into the driver's seat of the Buick; and several minutes later, the Buick driven by ORTEGA departed the area.  At approximately 7:22 p.m., ORTEGA told SANZ, "In five minutes there."  SANZ affirmed.  At approximately 7:31 p.m., surveillance observed the black Buick turn onto Sonoma Street, which was the known address at the time for SANZ.  At approximately 7:34 p.m., ORTEGA told SANZ, "It's all done."  SANZ asked, "Did you see her already?"  ORTEGA affirmed.  ORTEGA explained, "I told her to give me a second . . . [b]ecause I couldn't . . .  to do the thing in front of her."   I believe initially SANZ did not want 100 grams of fentanyl from EL BELLO because the quality of the last batch had not been very good ("No, no, not 100 pesos.  They gave me a few complaints from that last work"); that EL BELLO had a new and better quality of fentanyl ("I'm going to bring you from another one . . . because that one was from one that Kiki had"); that SANZ decided he wanted 100

grams of fentanyl from EL BELLO the following day ("Come over here because Primo's brother called . . . I'm going to start taking the stuff out"); ORTEGA contacted SANZ to arrange for the delivery of narcotics ("All good! So you bring up the thing you told me"); that the location of the delivery was going to be the same as it had been in the past ("[t]he same place as always"); that ORTEGA met with a female, who was a criminal associate of SANZ ("Did you see her already"); that ORTEGA delivered the narcotics ("It's all done") to Sonoma Street, based on surveillance; and that ORTEGA had to get the narcotics from the hidden compartment prior to giving it to the female associate of SANZ ("I told her to give me a second . . . [b]ecause I couldn't . . to do the thing in front of her").

G.    *On March 16, 2020, EL BELLO Picked up Narcotics Proceeds from SANZ*

113.    On March 16, 2020, EL BELLO, using target telephone # 13, spoke with SANZ, who was using telephone number (857) 300-9131.  EL BELLO went to one location to pick up narcotics proceeds from an associate of SANZ; was directed to second location to receive the proceeds; and was paid "four pesos" or $4,000 for the 100 grams of fentanyl, a price which is consistent with the price of fentanyl.

114.    On March 16, 2020, at approximately 12:23 p.m., EL BELLO told SANZ, "I'll head out there in 20 minutes, you heard?"  At approximately 1:45 p.m., surveillance observed the Black Buick on Blue Hill Avenue headed towards Sonoma Street in Mattapan, one of the known locations used by SANZ.  At approximately 1:57 p.m., the vehicle was observed parking across the street from 24 Sonoma Street.  At approximately 1:59 p.m., EL BELLO stated, "I'm here Primo."  SANZ stated, "Let me call the guy so he can go out."  SANZ is overheard speaking on another telephone, "The money . . . yo yo go outside . . . homeboy is outside."  SANZ then told EL BELLO, "The guy doesn't have the money there.  I have the money at the house . . . Let me

see if you can swing by the house and see if my wife/woman can give it to you . . . I forgot to bring it."  At approximately 2:03 p.m., SANZ stated, "Let me call, because my sister lives around there; she's got some money that belongs to me."  At approximately 2:06 p.m., SANZ stated, "[P]ut 131 Homestead on the GPS . . . That is my sister who is going to give you the four pesos."  At approximately 2:14 p.m., EL BELLO stated, "I am here, primo."  SANZ asked, "At my sister's?" EL BELLO affirmed.  SANZ asked what he was driving and EL BELLO responded, "The black car."  At approximately 2:14 p.m., surveillance observed the Black Buick park across from 131 Homestead Street, which was the residence of SANZ's sister, pursuant to intercepted calls.  At approximately 2:19 p.m., surveillance observed a woman, recognized as Undini Sanz, exit the front door carrying a manila envelope.  She gave the envelope to EL BELLO, through the passenger side of the vehicle.  EL BELLO then departed the area. I believe that EL BELLO went to a stash location for SANZ to pick up money that was proceeds from SANZ's sale of 100 grams of fentanyl previously provided by EL BELLO; that SANZ contacted an unknown criminal associate who resides at the stash house ("The money . . . yo yo go outside . . . homeboy is outside"); that SANZ asked the criminal associate to take the money out to EL BELLO; that the criminal associate told SANZ that the money was not there ("The guy doesn't have the money there"); that SANZ realized that he had forgotten to take the money from his house to the stash house (I have the money at the house . . . I forgot to bring it"); that SANZ then sent EL BELLO to his sister's house, where SANZ had money stashed ("[P]ut 131 Homestead on the GPS . . . That is my sister who is going to give you the four pesos"); that EL BELLO went to the sister's house; and that EL BELLO received $4,000 from the sister, which was payment for 100 grams of fentanyl that SANZ had received from EL BELLO on March 11, 2020.

115.    On March 17, 2020, at approximately 4:12 p.m., EL BELLO spoke to MEJIA-

ALVAREZ.  EL BELLO stated, "I gave a guy something just three days ago and he already called me to pay/give me money . . . I gave him 100 pesos three days ago.  And he called me to pay at once.  That's the way he is . . . He calls every three or four days . . . . 100 pesos."  I believe that this conversation was a reference to SANZ; the fact that SANZ received 100 grams of fentanyl on March 11, 2020; the fact that SANZ made a payment for the fentanyl on March 16, 2020; and the fact that SANZ received 100 grams of fentanyl every three or four days.

> H.  *On March 13-16, 2020, EL BELLO Wanted Criminal Associates, Including MEJIA-ALVAREZ, to Distribute 800 + Grams of Fentanyl, Which was Being Stored by Gordo*

116.    On March 13, 2020, at approximately 7:03 p.m., an outgoing call was placed on target telephone # 13 to telephone number (603) 506-8695.  EL BELLO spoke to Candelario Tovar-Garcia, a criminal associate of EL BELLO.   EL BELLO stated "Okay. Look, the stuff that I have here. If I put it with a five (5) for you, do you think we can resolve around there?  Tovar-Garcia stated, "I will have to ask primo, if you put it with what you said?"  EL BELLO confirmed, "3-5 for you . . . [c]heck if we can get it out with that number."  Tovar-Garcia stated, "I will dial him and I will tell him because he is interested in that.  He wanted to earn something there . . . [i]f I tell him: 'That number for you.  That number for you, move it right away.'  Maybe he will move faster."  Tovar-Garcia stated, "I will let you know in a bit."  I believe that EL BELLO was trying to distribute approximately 800 grams of narcotics; that he was willing to sell the narcotics to Tovar-Garcia for "3-5" or $35/gram; that Tovar-Garcia was going to check with his criminal associate regarding whether they could distribute the product.

117.    On March 16, 2020, at approximately 6:16 p.m., an outgoing call was placed on target telephone # 13 to target telephone # 11.  EL BELLO spoke to ORTEGA. EL BELLO stated, "Listen . . . and what about Gordo?  I think I am going to go over there tomorrow . . . to my friend's

from New Ham . . . I think I am going to bring him the whole thing of what you have left there."
ORTEGA stated, "Are you sure he/you is/are going to do it?" EL BELLO stated, "I think so. He
told me he was going to call me now." ORTEGA stated, "It's so I can call him and tell him so that
he is aware/ready . . . If not, he'll get lost and we won't find him." I believe that EL BELLO was
planning to take 800 grams of fentanyl to Tovar-Garcia ("I think I am going to go over there
tomorrow . . . to my friend's from New Ham . . . I think I am going to bring him the whole thing
of what you have left there") and that EL BELLO wanted ORTEGA to contact "Gordo" because
he was holding the 800 grams of fentanyl, so that it would be available for delivery ("It's so I can
call him and tell him so that he is aware/ready . . . If not, he'll get lost and we won't find him").

118.   On March 16, 2020, at approximately 10:27 p.m., an outgoing call was placed on
target telephone # 13 to telephone number (401) 263-3077. EL BELLO spoke to MEJIA-
ALVAREZ. MEJIA-ALVAREZ asked, "Is there a lot left?" EL BELLO stated "Around 840
more or less." EL BELLO stated, "See if they want to take all of it." MEJIA-ALVAREZ stated,
"Let me call them." I believe that EL BELLO wanted MEJIA-ALVAREZ to take and distribute
the 840 grams of fentanyl and that MEJIA-ALVAREZ was going to contact his criminal associates
in an attempt to determine whether he could distribute the drugs.

*I.    On March 19-22, 2020, Homerito Supplied EL BELLO and ORTEGA with 250
       Grams of Fentanyl, 100 Grams of Which was Delivered to SANZ*

119.   On March 19-22, 2020, as detailed below, Homerito agreed to lend EL BELLO 250
grams of fentanyl; EL BELLO instructed ORTEGA to get 250 grams of fentanyl from Homerito;
ORTEGA went and got the fentanyl from Homerito; and then ORTEGA delivered 100 grams of
fentanyl to SANZ.

120.   On March 19, 2020, at approximately 3:08 p.m., EL BELLO, using target telephone
# 13, spoke to Homerito. EL BELLO stated, "I was even going to call you to borrow 250 pesos

from you, you know of what . . . to pay the rent.  But I'm going to wait for a guy to call me."
Homerito stated, "No problem.  Hit me up."  Homerito further stated, "I'm waiting to see if I can
grab from him some of the same stuff that I grabbed from him.  I wanted to see if I could grab 50
from him but the number is too high."  I believe that EL BELLO wanted to "borrow 250 pesos"
or 250 grams of fentanyl from Homerito; that EL BELLO was going to "wait for a guy to call me,"
which was reference to SANZ calling and requesting another 100 grams of fentanyl; and that
Homerito was going to get the fentanyl from the same source of supply that he had used previously.

121.    On March 20, 2020, at approximately 5:41 p.m., EL BELLO spoke to Homerito.
Homerito stated, "You didn't go to pick up the thing you told me?"  What happened?  It didn't
show up?"  EL BELLO stated, "No, it didn't show up but I'm going to need it . . . for when they
call me."  Homerito stated, "I'm here, that's not a problem."  EL BELLO stated, "I am going to
tell this guy to go and get it."  Homerito stated, "[S]o you hit me up.  No problem."  EL BELLO
stated, "Let's see if we can get rid of the other one, that old stuff."  Homerito stated, "No, man . .
. [y]ou have to return that."  I believe that EL BELLO was expecting a shipment of fentanyl ("You
didn't go to pick up the thing you told me?"); that EL BELLO had not received the fentanyl ("No,
it didn't show up"); that EL BELLO needed to borrow the 250 grams of fentanyl from Homerito;
that EL BELLO was going to send ORTEGA to pick up the fentanyl ("I am going to tell this guy
to go and get it"); that EL BELLO wanted Homerito to get rid of the 840 grams of low quality
fentanyl that EL BELLO had ("Let's see if we can get rid of the other one, that old stuff"); and
that Homerito told EL BELLO to return the bad fentanyl ("No, man . . . [y]ou have to return that").

122.    On March 20, 2020, at approximately 6:39 p.m., ORTEGA, using target telephone
# 11, spoke to EL BELLO, using target telephone # 13.  EL BELLO stated, "Call Homerito because
he is going to lend you 250 pesos."  ORTEGA affirmed.  On March 21, 2020, at approximately

7:51 p.m., EL BELLO stated, "Grab Homerito's . . . because we have to go see the cousin tomorrow at 9:00 . . . [i]n the morning." ORTEGA stated, "I will check with Homerito tomorrow then." EL BELLO stated, "We have to check Homerito today." ORTEGA stated, "Let me call him then. On March 22, 2020, at approximately 8:54 a.m., EL BELLO asked, "Did you see Homerito last night?" ORTEGA stated, "No, I'm going to call him now. I called him last night and he did not answer." EL BELLO stated, "So go ahead then because the cousin needs that." I believe that EL BELLO wanted ORTEGA to contact Homerito and arrange to get 250 grams of fentanyl from Homerito and that the "cousin" was a reference to SANZ.

123. On March 22, 2020, at approximately 9:32 a.m., ORTEGA spoke to Homerito. ORTEGA stated, "I was told to stop by there to pick up a thing." Homerito asked ORTEGA, "Are you going to stop by right now?" ORTEGA stated, "Like in half hour." Homerito stated, "Okay no problem . . . That would be ready." At approximately 10:17 a.m., ORTEGA stated, "I'm on my way there; I was waiting for this guy to pick me up." At approximately 10:34 a.m., ORTEGA stated, "I'm here at the door." I believe that ORTEGA was travelling to pick up the 250 grams of fentanyl from Homerito.

124. On March 22, 2020, at approximately 9:49 a.m., EL BELLO spoke to ORTEGA. ORTEGA stated, "I'm getting ready now I'm going to Homerito's . . . I'm leaving now." At approximately 10:28 a.m., ORTEGA stated, "I'm on my way . . . We'll be there soon." I believe that ORTEGA was telling EL BELLO that he was getting the fentanyl from Homerito.

125. On March 22, 2020, at approximately 12:47 p.m., ORTEGA spoke to SANZ, who was using telephone number (857) 300-9131. ORTEGA stated, "I was on my way there and I had to come back; I've been calling you for a while and you did not answer me." SANZ stated, "Yes come here!" ORTEGA asked, "Same place?" SANZ stated, "Sonoma." ORTEGA affirmed. At

approximately 2:04 p.m., ORTEGA stated, "I will be there in like 10 or 15 minutes."   At approximately 2:20 p.m., ORTEGA stated, "I'm here."   At approximately 2:24 p.m., "Come here and get in; I'll see you at the corner.   So we are not that obvious."   SANZ stated, "Okay pick me up right here at the front."    I believe that ORTEGA travelled to meet with SANZ ("I'm here"); that SANZ got into the vehicle with ORTEGA ("Come here and get in; I'll see you at the corner"); that ORTEGA was concerned about not being obvious in the transfer of the fentanyl ("So we are not that obvious"); and that ORTEGA distributed 100 grams of fentanyl to SANZ.

> **J.   On March 21, 2020, Law Enforcement Seized 990 Grams of Fentanyl from MARINEZ-MATOS, Which Was Intended for EL BELLO, ORTEGA, and Gordo**

126.   On March 21, 2020, a series of interceptions and investigation led to the seizure of 990 grams of fentanyl.   As detailed below, EL BELLO, using target telephone # 13, contacted MARINEZ-MATOS to arrange for the exchange of narcotics; EL BELLO tasked ORTEGA, using target telephone # 11, and Gordo to go to Connecticut and receive the narcotics; ORTEGA communicated with MARINEZ-MATOS and Gordo regarding the timing and logistics of the transfer meeting; then, just prior to the transfer of the narcotics, MARINEZ-MATOS was arrested with almost a kilogram of fentanyl in his waistband; and ORTEGA communicated with EL BELLO regarding the fact that MARINEZ-MATOS never arrived with the narcotics.

127.   On March 21, 2020, at approximately 11:43 a.m., EL BELLO spoke to UM3523, later identified as Jeison Manuel MARINEZ-MATOS.   EL BELLO stated, "I'm calling on behalf of Chispa."   MARINEZ-MATOS stated, "[Y]es he told me . . . [T]alk to me . . . [S]o let me send you the address . . . I'll send it to you now."   EL BELLO affirmed.   At approximately 11:48 a.m., an incoming text message was received by EL BELLO.   The text message stated, "490 maplewood ave Bridgeport Connecticut."   I believe that EL BELLO was contacting MARINEZ-MATOS to receive narcotics; that the statement, "I'm calling on behalf of Chispa" was a code for the fact that

they were supposed to deal with each other, and that the narcotics delivery was to take place at "490 maplewood ave Bridgeport Connecticut."

128.    On March 21, 2020, at approximately 11:50 a.m., EL BELLO spoke to ORTEGA. EL BELLO stated, "I thought it was right here, but it's in Connecticut . . . Call this guy so he can go with you."  ORTEGA asked, "Gordo?"  EL BELLO stated, "Yes.  And we can give him a couple of things."  ORTEGA asked, "[W]here?"  EL BELLO stated, "I will send you the address right now."  At approximately 11:53 a.m., an outgoing text message was sent on target telephone # 13 to target telephone # 11.   The text message stated, "490 maplewood ave Bridgeport Connecticut."  At approximately 12:31 p.m., ORTEGA spoke to Gordo.  ORTEGA stated, "Let's go and run an errand."  Gordo stated, "Okay pick me up."  At approximately 12:54 p.m., ORTEGA stated to Gordo, "On my way there."  I believe that EL BELLO tasked ORTEGA and Gordo to travel to Connecticut to pick up the narcotics from MARINEZ-MATOS; that Gordo was going to be paid in "things" or narcotics for his assistance; that ORTEGA informed Gordo that they were going to run an "errand," which was code for picking up narcotics; and that ORTEGA picked up Gordo prior to Gordo's departure for the trip.

129.    On March 21, 2020, at approximately 3:43 p.m., ORTEGA spoke to MARINEZ-MATOS.  ORTEGA stated, "I will be there like in 15 or less."  MARINEZ-MATOS stated, "Let me know when you get there . . . when you get there call me because I will send you another thing there that's right there, very close."   At approximately 3:57 p.m., ORTEGA spoke to MARINEZ-MATOS.  ORTEGA stated, "I am out front . . . I am in a black car."  Surveillance confirmed that the black Buick, used by the organization to transport narcotics in a hidden compartment, was in the vicinity of the planned fentanyl delivery.  Precise location data revealed that ORTEGA was not, in fact, in Connecticut.  I believe that ORTEGA sent Gordo, in the black Buick, to Connecticut

alone to pick up the kilogram of fentanyl.

130. On March 21, 2020, at approximately 4:00 p.m., ORTEGA spoke to Gordo. ORTEGA asked, "Are you in front of the number?" At approximately 4:05 p.m., ORTEGA spoke to MARINEZ-MATOS. MARINEZ-MATOS asked, "[Y]ou are at the one I sent you, right?" ORTEGA affirmed. MARINEZ-MATOS explained, "I am walking, so you can start moving up, that way you are not standing there." ORTEGA asked, "What do you have on?" MARINEZ-MATOS stated, "A green coat." At approximately 4:06 p.m., ORTEGA spoke to Gordo. ORTEGA stated, "You drive as the numbers go down . . . The guy has a green jacket. He's walking around there." Gordo said, "I don't see him, where is he . . . I'm already here at the Dominican bodega." At approximately 4:09 p.m., ORTEGA stated, "259, a bodega with the name J and J. He's going to be in front of the bodega." Gordo affirmed. I believe that MARINEZ-MATOS was going to deliver the fentanyl to Gordo; that ORTEGA was facilitating the meeting between MARINEZ-MATOS and Gordo; and that ORTEGA was informing Gordo regarding the location of MARINEZ-MATOS and the fact that MARINEZ-MATOS was wearing a "green coat."

131. On March 21, 2020, at approximately 3:55 p.m., surveillance observed the black Buick Regal, known to be used by EL BELLO and ORTEGA to distribute narcotics, arrive and park on Laurel Avenue near the corner of Maplewood Avenue in Bridgeport, Connecticut. Approximately ten minutes later, agents observed the Buick circle the area, appearing lost or looking for a certain location. Surveillance observed the driver of the vehicle to be a large/stocky medium to dark skinned Hispanic male with a bushy beard, believed to be Gordo. At approximately 4:00 p.m., agents observed a male, later identified as Jeison Manuel MARINEZ-MATOS, walking around the area of Maplewood Avenue, talking on a cellular telephone, and wearing a green coat. At approximately 4:10 p.m., the same male was observed standing in front

of the bodega, which had been referenced in the intercepted telephone calls, still talking on the cellular telephone, wearing a green coat, and holding a shopping bag. At approximately 4:15 p.m., a marked police cruiser approached MARINEZ-MATOS. MARINEZ-MATOS acted nervous and was observed grabbing at his waist line. Agents discovered a kilogram of a powdery substance concealed in his waistband. Subsequent lab analysis revealed that the package contained 990.9 grams of fentanyl. MARINEZ-MATOS was placed under arrest and taken into custody. While in custody, officers observed that MARINEZ-MATOS received incoming calls on his telephone from the telephone used by ORTEGA and the telephone used by Gordo.

132.    On March 21, 2020, at approximately 4:26 p.m., EL BELLO spoke to ORTEGA. ORTEGA stated, "Dude!  Call these people . . . they have me waiting and going back and forth and now they are not answering the fucking phone."    At approximately 4:28 p.m., ORTEGA spoke to Gordo.  ORTEGA asked, "Did he answer you?"  Gordo stated, "He did not pick up." ORTEGA stated, "This one is calling him to see."  Gordo affirmed.  I believe that ORTEGA had given the telephone number of MARINEZ-MATOS to Gordo; that ORTEGA had asked Gordo to reach out to MARINEZ-MATOS directly; that Gordo had reached out to MARINEZ-MATOS; that MARINEZ-MATOS had not answered Gordo's call either; and that ORTEGA was informing Gordo that EL BELLO was contacting MARINEZ-MATOS ("This one is calling him to see").

133.    On March 21, 2020, at approximately 4:43 p.m., EL BELLO spoke to ORTEGA. EL BELLO asked, "Did he call you?"  ORTEGA stated, "No."  EL BELLO told ORTEGA to wait. ORTEGA asked, "[H]ow long?"  EL BELLO stated, "[U]ntil he gets in touch because he has to give you that thing . . . because we aren't playing around."    I believe that EL BELLO was instructing ORTEGA to stay in Connecticut and wait for MARINEZ-MATOS until he heard from

MARINEZ-MATOS because the receipt of the narcotics was important ("[U]ntil he gets in touch

because he has to give you that thing . . . because we aren't playing around").

> **K.** *On April 15, 2020, Law Enforcement Seized 120 Grams of Pills from MEJIA-ALVAREZ*

134.    On April 15, 2020, a car stop was conducted on the Black Buick, used by EL

BELLO, ORTEGA, and other members of the organization, to transport narcotics.  MEJIA-

ALVAREZ was the passenger of the vehicle.  A search was conducted of the vehicle and

approximately 120 grams of counterfeit tablets were discovered, concealed in a hidden

compartment.  Lab analysis of one of the tablets revealed the presence of fentanyl.

135.    On April 15, 2020, a Massachusetts State Police Trooper observed a black colored

Buick Regal, Rhode Island Registration ZT366, which was a vehicle used by EL BELLO and

others to transport narcotics in a hidden compartment during this investigation.  The Trooper had

received information that the vehicle was involved in drug trafficking activity and was believed to

be equipped with an after-market compartment, used to secrete and transport narcotics.  At

approximately 12:30 p.m., the vehicle was observed traveling in the middle lane at approximately

75 miles per hour.  The Trooper pulled out into the road and observed the vehicle brake suddenly,

change lanes, and come within a car length of the vehicle in front of it.  The vehicle then exited

the highway.  A car stop was conducted.  The driver of the vehicle was informed that she had been

stopped for speeding and following too closely.  The driver of the vehicle stated that "Jose" was

the owner of the vehicle and that she did not know the last name of the owner of the vehicle.  The

driver further stated that the passenger of the vehicle, later identified as Hanlet MEJIA-

ALVAREZ, was her husband.  The driver of the vehicle consented to a search of the vehicle.  A

search of the vehicle revealed a possible after-market compartment.  The vehicle was towed to the

State Police barracks.  A canine was brought to the vehicle, but the canine did not alert to the

presence of narcotics.  The compartment was searched.  Inside the compartment officers found a sphere shaped package of electrical tape with numerous blue pills inside.  The pills were marked with an "M" on one side and a "30" on the other side.  Laboratory analysis revealed that one pill tested weighed .112 grams; that the pill contained fentanyl; and that approximately 100 grams of material is yet untested.

### IV.     Toll Records for RIVERA Show that He Is Still Actively Distributing Narcotics

136.     Toll records for RIVERA's most recent telephone show that RIVERA's narcotics distribution is ongoing to the present.  Toll records for telephone number (401) 626-9121, RIVERA's most recent intercepted telephone, reveal significant contact with numerous narcotics customers of RIVERA, which based on my experience, is consistent with RIVERA actively continuing his narcotics trafficking activities.  For example, between September 21, 2020, and October 6, 2020, RIVERA has had 188 contacts with telephone number (401) 545-2074, used by UM2074 who is an unidentified fentanyl customer of RIVERA; 176 contacts with telephone number (401) 548-0672, used by Michael Lilly, who is a cocaine and fentanyl customer of RIVERA; 101 contacts with telephone number (774) 291-1053, used by UM1053, who is an unidentified narcotics customer of RIVERA;  71 contacts with telephone number (401) 347-9307, used by Chino, an unidentified fentanyl customer of RIVERA; and 10 contacts with telephone number (774) 322-0278, used by John Cote, a cocaine customer of RIVERA.  Additionally, RIVERA has been in contact with three known narcotics sources of supply, EL BELLO, BAEZ, and Alexis Troncoso-Jimenez.  The criminal relationships between RIVERA and EL BELLO and between RIVERA and BAEZ are detailed in this Affidavit.  The criminal relationship between RIVERA and Troncoso-Jimenez is detailed below.  Between September 21, 2020, and October 6, 2020, there have been the following additional contacts with RIVERA's telephone:  50 contacts

with target telephone # 13, used by EL BELLO; 4 contacts with telephone number (857) 492-2290,

used by BAEZ; and 3 contacts with telephone number (857) 247-5555, used by Troncoso-

Jimenez.[5]  Based on the foregoing, I believe that RIVERA's distribution activities are ongoing to

the present and that RIVERA is currently actively distributing cocaine and fentanyl.

## CONCLUSION

137.   Based on the information set forth above, I believe probable cause exists to

conclude that ALFONSO, Mark ALFONSO, BAEZ, CALDERON, DASILVA, DUPRAS,

JAVIER, LANDRAU-MARRERO, MARINEZ-MATOS, MEJIA-ALVAREZ, MEJIA-DIAZ,

ORTEGA, RIVERA, and SANZ have conspired to possess with intent to distribute, and to

distribute 500 or more grams of cocaine and 400 or more grams of fentanyl, Schedule II controlled

---

[5] On June 29, 2019, at approximately 3:47 p.m., an incoming call was received on target telephone # 1 from telephone number (857) 247-5555.  RIVERA spoke to UM5555, later identified as Troncoso-Jimenez. Troncoso-Jimenez asked RIVERA, "I will ask you a question but you tell me the truth . . . how much are you getting that for . . . the one from 'arriba.'"  RIVERA stated, "[W]hen I grab 100 pesos they give it to me for 32; when I grab half at 30 ½; when I grab one at 31 . . . sometimes when it is scarce the prices vary."  Troncoso-Jimenez stated, "I will tell you the truth right now, I already called a couple people, and they told me they agree with it . . . I am going to head down to the Apple again to grab that because I left it yesterday."  RIVERA stated, "I just grabbed one now here and paid almost 37 for it . . . I had to grab from the person that I supply to, that's unbelievable."  Troncoso-Jimenez stated, "I will go pick that up, and I will show it to you . . . I have two there that I could give you for 34 so you guys could make tons of money . . .  at 34 pesos."  RIVERA asked, "[O]riginal, the way it always comes."  UM5555 stated, "Of course, . . . there are people who baptize it.  I am not into the shit."  RIVERA explained "[W]hat I grab for me is 100, 150, sometimes 200."  Tronocos-Jimenez stated, "I will hit you up so you at least try to grab 100."

substances, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(vi), and 841(b)(1)(B)(ii).

I, Kevin C. Hersey, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Kevin Hersey
Special Agent
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this _16 th_ day of October, 2020.

HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS